Bennie L. WHITFIELD et al., Appellant,

v.

UNITED STEELWORKERS OF AMER-
ICA, LOCAL NO. 2708, et al.,
Appellee.

No. 17290.

United States Court of Appeals
Fifth Circuit.

Jan. 30, 1959.

Rehearing Denied Feb. 24, 1959.

Roberson L. King, Dent, King, Walker & Wickliff, Houston, Tex., for appellants.

George Rice, Butler, Binion, Rice & Cook, Houston, Tex., for appellees Sheffield Steel Corp. and Armco Steel Corp.

Chris Dixie, Dixie & Schulman, Houston, Tex., for appellee Local No. 2708 United Steelworkers of America, and Claude Baldree.

Before HUTCHESON, Chief Judge, and RIVES and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

Five negro members of an integrated union assert that their union, under the guise of equalizing job opportunities at

their employer's plant, negotiated a collective bargaining agreement that subtly but effectively discriminates against negro employees.

■ Plaintiffs-appellants work at the Houston steel plant of the Sheffield Division of Armco Steel Corporation. They are members of Local 2708, United Steelworkers of America, AFL-CIO, the certified exclusive bargaining agent for production and maintenance workers at the plant. The plaintiffs brought a class action against the Union and the Company attacking the validity of a collective bargaining agreement dated May 31, 1956, and seeking an injunction, a declaratory judgment, and damages. The case was tried to the court without a jury. After a lengthy trial and after findings and an opinion that reflect careful consideration of all the facts, the able district judge held that the contract was fair and free from racial discrimination. We affirm.

■ The complaint is based on the principle that a certified bargaining agent is under a duty to represent all employees fairly. Steele v. Louisville & Nashville R. Co., 1944, 323 U.S. 192, 65 S.Ct. 226, 232, 89 L.Ed. 173.[1] The Union and Sheffield do not take issue with the theory on which the case is brought. Their position is that the contract is fair and nondiscriminatory. In the Steele case the Supreme Court stated:

> "[The duty imposed on the bargaining representative] does not mean that the statutory representative of a craft is barred from making contracts which may have unfavorable effects upon some members of the craft represented. Variations in the terms of the contract based on differences relevant to the authorized purposes of the contract in conditions to which they are to be applied, such as differences in seniority, the type of work performed, the competence and skill with which it is performed, are within the scope of the bargaining representation of a craft, all of whose members are not identical in their interest or merit."

■ Thus, the provisions of the collective bargaining agreement must be *relevant* to the conditions of the particular industry and company to which they are to be applied. An agreement will be judicially condemned only in the case of "discriminations not based on such relevant differences. [D]iscriminations based on race alone are obviously irrelevant and invidious."

■ The question before the Court is whether the May 31 contract is fair, not only to the five negro plaintiffs but to all Sheffield employees. If there are distinctions between the treatment of negro employees and the treatment of white employees, do such distinctions have their basis in relevant and reasonable differences or are the distinctions invidious discriminations based on race? What is fair is a moral decision resting on the conscience of the Court. To reach a just decision, it is necessary to examine and weigh the facts that produced the May 31 contract.

### Background.

The steel mill started operations in 1942. Since that time the Union has been the exclusive bargaining agent for production and maintenance workers. Almost without exception, all negroes employed at the mill belong to the Union. This membership is voluntary, since Texas laws prohibit union shops. Of approximately 3,000 employees in the bargaining unit 1,700 are white and 1,300 are negro employees. The Union has always been integrated. Negro members hold office in the Union, particularly the key office of Plant Grievance Chairman, and have always partici-

---

1. See also Hughes Tool Company v. N. L. R. B., 5 Cir., 1945, 147 F.2d 69, 158 A.L.R. 1165; Tunstall v. Brotherhood of Locomotive Firemen, 1944, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187; Ford Motor Co. v. Huffman, 1953, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048; Syres v. Oil Workers International Union, Local No. 23, 1955, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785.

548

pated actively and responsibly in all features of the collective bargaining process.

When the Company commenced steelmaking in 1942 it employed white persons for skilled jobs and negroes for unskilled jobs, in accordance with local custom but chiefly because the only available skilled workers were white. From 1942 through 1946, by government regulation, the Company hired employees only through the United States Employment Service.

Collective bargaining contracts between the Union and the Company are master contracts covering the operations of steel plants throughout the country. These contracts, which are common in the steel industry, provided that at each local plant seniority units, lines of progression, would be established within a department.

For purposes of seniority, the Houston plant, like other steel mills in the country, is divided into departments. In accordance with the master contract, each department is divided into two lines of progression, each line constituting a seniority unit. Each line of progression encompasses a distinct operation and is composed of a series of interrelated jobs. The jobs start with the easiest in terms of skill, experience, and potential ability and progress step by step to the top job in the line. The knowledge acquired in a preceding job is necessary for the efficient handling of the next job in the progression.[2] Throughout the years, the skilled jobs within a department were grouped together in logical sequence and called the Number 1 Line of Progression. The unskilled jobs were also logically grouped together and called the Number 2 Line of Progression. Until the 1956 contract, the Number 1 lines were staffed by white employees and the Number 2 lines by negro employees.

Before the 1956 Agreement, those who applied for jobs in a Number 1 line were closely screened. Even after Sheffield was satisfied that an applicant possessed the qualities needed to progress in the line, he was subjected to a probationary period of two hundred and sixty hours. Any employee who failed to meet with the Company's approval could be discharged at the will of the Company during that period.

As to the Number 2 lines, from 1949 to 1956 all negroes started in the labor pool, or labor department. From the labor pool they bid into the starting jobs in the Number 2 lines. When laid off, a negro employee went back to the labor pool instead of losing a job altogether. Only negroes were hired into the labor pool.

In November, 1954, the first complaints of racial discrimination were made. Some negro employees were dissatisfied with the fact that they could not bid on jobs in the Number 1 lines of progression. As a result of the grievances, negotiations were commenced immediately between the Union and Sheffield. Negotiations were conducted between Company representatives and a Joint Seniority Committee composed of two negro and two white members of the Union. One of the two negro representatives was the Plant Grievance Chairman. In negotiations that lasted for almost a year the Union and Company representatives explored extensively a sound and fair basis for permitting negro employees to enter Number 1 lines of progression. The result of the negotiations was the agreement of May 31, 1956.[3]

2. The district court found:
"Accordingly, no employee of any race has been allowed to bid into any Line of Progression at any point above the bottom job, and no employee of any race has been allowed to be promoted out of line of his seniority in that particular Line of Progression."

3. The two negro members of the Union Committee opposed the agreement. At the ratification meetings, the Union membership as a whole ratified the agreement 1412 to 202. Some 900 negroes attended the meetings but most of them declined to vote yes or no. Those negroes who voted cast approximately 200 to 14 against.

## The May 31, 1956 Agreement.

The agreement made substantial changes in the Company's employment practices. Each bottom job in a Number 1 line was changed from a starting job, subject to the Company's uncontrolled screening, to a bid job. In doing this the Company had to give up its right of original selection. Under the agreement, no pool of white employees can be maintained to fill vacancies in a Number 1 line. Employees in Number 2 lines, negroes, are given preferential rights to fill vacancies in Number 1 lines. Any vacancy in a Number 1 line must now be filled by offering the job first to the bid of an employee in a Number 2 line in the same department, provided the employee first passes a qualifying test. If there is no employee in a Number 2 line in the same department who has passed the qualifying test, then a man in the labor pool who has passed the test may bid for the job. Both whites and negroes now must start in the labor pool. The Company relinquished all screening rights and terminated the 260 hour probationary period. A qualification test takes the place of rigid screening.[4] Once an employee passes the test, he is subject to no more investigation or screening. If he bids from a Number 2 line to a Number 1 line, he is entitled to fill the vacancy, if he has passed the test. The test is given to all employees who enter starting jobs in a Number 1 line, whether they are white or negro. Thus, under the agreement, openings in starting jobs in a Number 2 line are filled from the labor pool. Openings in starting jobs in a Number 1 line are filled first from the Number 2 line in the same department, then from the labor pool if there are no qualified Number 2 line employees. If there is racial discrimination under the new contract, it is discrimination in favor of negroes.

The appellants complain that the agreement preserves the old inequalities. (1) They object to the qualification test for Number 1 lines. The effect is to require all negro applicants to take the tests since on May 31, 1956, all employed negroes were in the Number 2 lines. (2) They object to the fact that one who bids into a Number 1 line from a Number 2 line must start at the bottom job. This will mean a wage cut in a case where the negro is up the ladder in a Number 2 line.

## The Requirement of a Qualification Test.

The appellants complain that they are discriminated against because the incumbents in a Number 1 line are not required to take the test to remain within the line or to be promoted. The in-

---

4. The district court found:

"During the negotiations for the May 31st, 1956, Agreement, the Union bargained for and obtained substantial concessions from the Company concerning the uniformity and fairness of the Company test, and provided adequate machinery to check the examination results, thereby assuring all employees equal and fair treatment.

"The examinations accepted by the Company and administered to the employees are tests in wide commercial usage, and are scientifically designed to reveal the potentiality of the employee to promote to the highest skilled jobs in the plant. The examinations are a fair and reasonable substitution of the Company's right to an original selection. No question was raised at the trial in regard to the fairness with which the tests were administered. The record reveals that approximately 90 negro employees have passed the examinations and approximately 45 have moved into the bottom jobs of a No. 1 Line of Progression. The other 45 constitute a reservoir of qualified employees to move into the No. 1 Line of Progression as and when the bottom jobs open. This number has qualified themselves in spite of the fact that most of the negro employees in the plant have declined the invitation to take the examination. Several negro witnesses at the trial testified that they declined to take the examination as a matter of principle or for personal reasons, and there is a substantial evidence in the record from which the court concludes that there has been voluntary refusal to take the examination on the part of most of the negro employees, apparently in reliance upon this litigation as a means by which such requirement will be dispensed with."

cumbents, however, have already been screened and then subjected to two hundred and sixty hours of probation in which they had to prove their merit or be discharged. The tests seem to be a reasonable substitute for these requirements which the Company relinquished in the May 31 contract. Excluding incumbents from the tests is based not on race but on their having already successfully passed screening and probation, at least equal to the tests. It is true that because negro employees in the past were only in Number 2 lines such negroes are treated differently from white incumbents. But fairness is not achieved by treating the white incumbents unfairly. Efficiency is not achieved by giving negro applicants for Number 1 lines job advantages unrelated to their qualifications. It seems to us that the Company and the Union went about as far as they could go in giving negroes a preference in filling Number 1 line vacancies, consistent with being fair to incumbents and consistent with efficient management.

The district court held that the test requirement is the "minimum assurance" the Company could have of efficient operations, and that it was not a discriminatory requirement. We agree.

The Requirement That An Employee Enter A Number 1 Line At The Bottom Or Starting Job.

The May 31 agreement eliminated racially separate lines of progression and opened all lines to all races. The Number 1 lines, however, remain a group of interrelated skilled jobs within a department. Jobs in a Number 1 line do not overlap jobs in a Number 2 line. Thus, an employee must start at the bottom in order to work his way up the Number 1 line. Such a system was conceived out of business necessity, not out of racial discrimination. An employee without the proper training and with no proof of potential ability to rise higher, cannot expect to start in the middle of the ladder, regardless of plant seniority. It would be unfair to the skilled, experienced, and deserving employee to

give a top or middle job to an unqualified employee. It would also destroy the whole system of lines of progression, to the detriment of efficient management and to the disadvantage of negro as well as white employees having a stake in orderly promotion.

If a negro in a top job in a Number 2 line wishes to enter a Number 1 line, he must start at the bottom. A lower salary to him, however, is not discrimination on the ground of race; the pay depends on the job and is the same for whites and negroes. He takes his chances on promotion and higher pay later in Number 1 line jobs. Certainly he is not entitled to receive more than others in the same job having the same qualifications. Finally, even if a negro were dissuaded from bidding into a Number 1 line because it would mean a pay cut, the vacancy would then be open to another negro.

In Steele v. Louisville & Nashville R. Co., 1944, 323 U.S. 192, 65 S.Ct. 226, 235, 89 L.Ed. 173, union discrimination was obvious. The complainant proved that the union was trying to eliminate negroes from service as firemen under the Railway Labor Act, 45 U.S.C.A. § 151 et seq. White employees of inferior competence had replaced the negro employees, although they were both equal in seniority. Only a white person could be assigned to a new job. Each seniority district was allowed only a small percentage of negroes. The record in that case bore out an "ugly example of economic cruelty". We have the exact opposite situation before us. The May 31 agreement makes available to the negro employees at Sheffield new jobs, higher pay, and it equalizes job opportunities for starting jobs after May 31, 1956. Whatever dissatisfaction the agreement brings to the appellants, as Line Number 2 incumbents, it cannot be blamed on racial discrimination in the existing agreement.

Although the Steele case specifically involved the Railway Labor Act, its principles apply with equal vigor to cases arising under the National Labor

Relations Act, 29 U.S.C.A. § 151 et seq. Syres v. Oil Workers International Union, Local No. 23, 1955, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785, reversing 5 Cir., 1955, 223 F.2d 739; Ford Motor Co. v. Huffman, 1953, 345 U.S. 330, 73 S.Ct. 681, 686, 97 L.Ed. 1048. A union has a wide range of discretion under the Act, as long as it acts in good faith in the exercise of its discretion. In the Ford Motor case the question was whether the union, in a collective bargaining agreement with Ford, discriminated against veterans because of the system of determining seniority rights established in the agreement. The Supreme Court held that although the seniority rights of some veterans would be prejudiced, the union did not exceed its authority under the Act. The Court made the following observation:

> "Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. *The complete satisfaction of all who are represented is hardly to be expected.* A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion."

We think that Sheffield and the Union have acted well within the standards discussed in the Steele, Syres, and Ford Motor cases.

The problem before us is not unique. It is bound to come up every time a large company substitutes a program of equal job opportunity for previous discriminatory practices. In such case it is impossible to place negro incumbents holding certain jobs, especially unskilled jobs, on an absolutely equal footing with white incumbents in skilled jobs. In this situation time and tolerance, patience and forbearance, compromise and accommodation are needed in solving a problem rooted deeply in custom.

We attach particular importance to the good faith of the parties in working toward a fair solution. It seems to us that the Union and the Company, with candor and honesty, acknowledged that in the past negroes were treated unfairly in not having an opportunity to qualify for skilled jobs. They balanced the interests of negroes starting Line 1 jobs against the interests of employees who have worked previously in Line 1 jobs, in the light of fairness and efficient operation. After many months of negotiations, and having in mind their duty to all the employees and the need for proper management, they came up with the May 31 agreement, an honest attempt to solve a difficult problem. Courts, when called upon to eye such agreements, should not be quick to "substitute their judgment for that of the bargaining agency on the reasonableness of the modifications". Pellicer v. Brotherhood of Railway and Steamship Clerks, 5 Cir., 1954, 217 F.2d 205, 206. The Union and the Company made a fresh start for the future. We might not agree with every provision, but they have a contract that *from now on* is free from any discrimination based on race. Angels could do no more.

It is undeniable that negroes in Line Number 2, ambitious to advance themselves to skilled jobs, are at disadvantage compared with white incumbents in Line Number 1. This is a product of the past. We cannot turn back the clock. Unfair treatment to their detriment in the past gives the plaintiffs no claim now to be paid back by unfair treatment in their favor. We have to decide this case on the contract before us and its fairness to all.

Considering the contract from the standpoint of all the employees and recognizing the necessity for reasonable standards of operating efficiency, we find that there is no evidence of unfairness or discrimination on the ground of race.

The judgment is

Affirmed.