UNITED STATES of America, by Ramsey CLARK, Attorney General, Plaintiff,

v.

HAYES INTERNATIONAL CORPORATION, a corporation, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW–AFL–CIO), an unincorporated association, and Local 1155, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW–AFL–CIO), an unincorporated association, Defendants.

Civ. A. No. 68–159.

United States District Court

N. D. Alabama, S. D.

June 21, 1968.

Ramsey Clark, Atty. Gen., Stephen J. Pollak, Asst. Atty. Gen., and Frank M. Dunbaugh, Atty., Dept. of Justice, Washington, D. C., and Macon L. Weaver, U. S. Atty., Birmingham, Ala., for plaintiff.

Cabaniss, Johnston, Gardner & Clark, and Drayton Nabers, Jr., Birmingham, Ala., for Hayes International Corp.

Stephen I. Schlossberg, John Fillion, Detroit, Mich., and Bernard G. Link, Baltimore, Md., for other defendants.

OPINION

LYNNE, Chief Judge.

I

Alleging a pattern or practice of resistance under section 707 of Title VII of the Civil Rights Act of 1964 [1], the Attorney General instituted this action against Hayes International Corporation (herein referred to as "the Company") and joined the United Automobile, Aerospace & Agricultural Implement Workers of America and its Local Union No. 1155 (herein referred to as "the Union") as parties needed for just adjudication under Rule 19 of the Federal Rules of Civil Procedure.[2]

On April 24, 1968, the plaintiff filed a motion for preliminary injunction alleging irreparable injury to certain Negro employees by reason of the Company's institution and implementation of a' transfer procedure.

The hearing on this motion was held before the court on June 3, 4, and 5, 1968. Having carefully considered the testimony of the witnesses and the documents introduced in evidence, the court is of the firm opinion that for the reasons set forth herein, the motion for preliminary injunction is due to be denied.

II

The general background facts are as follows:

The Company is engaged in the aircraft and aerospace industry and, at its facility in Birmingham, Alabama, the subject of this action, is engaged primarily in the overhaul and repair of military aircraft and aircraft assemblies.

At the present, the Company is engaged at the Birmingham facility in the performance of overhaul and repair contracts on four types of military aircraft, the KC–135, C–97, C–124, and C–130. Such contracts call for extensive work on the aircraft engines, landing gear, hydraulic systems, sheet metal surfaces, radio and radar systems, and other operating components of the aircraft.

For purposes of collective bargaining, the employees at the Birmingham facility are in four bargaining units. The largest unit, consisting of the production and maintenance employees, is and has been represented by the Union since 1952. At the present, this production and maintenance unit contains some 2,300 employees on the active payroll in approximately 125 jobs. The jobs in the production and maintenance unit are arranged, according to job function, into some forty lines of progression, and the lines of progression are in turn functionally grouped into nine seniority divisions.

The record shows without dispute that the work performed by the Company on these military aircraft is exacting and that it requires highly skilled and experienced workers in the higher job classifications in the lines of progression. The assignment to these jobs of inexperienced workers would not only impair the efficient and economical performance of the Government contracts but would involve serious risks to the operating safety of critically important military aircraft. The different lines of

---

1. 42 U.S.C.A. § 2000e et seq.

2. This court has previously held that in Title VII cases bringing into issue seniority, promotions, and similar matters, the Union should be joined under Rule 19. E. g., United States v. H. K. Porter Co., 296 F.Supp. 40.

progression reflect the necessity for different skills and for extensive on-the-job training in each type of work.

The Company commenced operation at its Birmingham facility in 1951 to perform overhaul and repair work on B–25 aircraft being used in the Korean War. For the skilled jobs, the Company was able to draw upon a reservoir of applicants who had worked at the Birmingham facility for another Government aircraft contractor during World War II or who had aircraft experience during their military service, and such applicants were for the most part white. At the same time, the Negro applicants, not having comparable experience, were assigned to jobs involving the cleaning and chemical treatment of aircraft surfaces and to maintenance jobs.

The evidence shows that the Company's Negro employees presently are earning wages substantially equal to the average earnings of white employees.

On the present record, there has been no attempt by the parties to submit evidence regarding the movement of Negro employees between seniority divisions prior to the transfer program at issue here. However, the testimony of Negro employees at the hearing shows there was at least one prior such occasion when, several years ago, the Company offered Negro employees in the cleaner line of progression transfers to jobs in an Inspector line of progression.

At the time that the complaint in this action was filed, the Company and the Union were engaged in the negotiation of a new three-year collective bargaining agreement. The result of these negotiations was the 1968 contract, which included the following basic features:

(1) The seniority division and lines of progression which had been composed predominantly of Negro employees were merged into other seniority divisions and lines of progression which had been composed of predominantly white employees. Specifically, the line of progression consisting of the cleaner jobs was transferred and merged into a seniority division containing five other lines of progression which had been manned predominantly by white employees. Similarly, the maintenance jobs were consolidated into a single job and placed in a previously predominantly white line of progression containing other jobs involving the operation of plant vehicles.

(2) The jobs in the cleaner line of progression were upgraded so that their wage rates were comparable to the rates of the jobs in the other lines of progression in the seniority division into which such line of progression was merged.

(3) There was established a layoff pool providing laid-off employees with considerably wider rights of recall than had previously been available.

### III

Turning to the transfer program which is at issue here, the evidence establishes the following.

For some time prior to the institution of this action, the Company had been considering, and had discussed with the Union, procedures for the transfer of Negro employees in the cleaner jobs and maintenance jobs to other seniority divisions.

The Company, acting on its own initiative, instituted this transfer program on April 12, 1968, some four days after the collective bargaining agreement became effective. The sole purpose of the program was to extend to its Negro employees special opportunities for transfer, training and advancement in other areas of work. Similar privileges have not been extended to white employees.

It is not disputed that this transfer program provides for the Negro employees in the cleaner line of progression and maintenance jobs, rights of transfer which have never before been available to any employee of the Company. In broad outline, the program provides that the Negro employees in the cleaner line of progression and maintenance jobs may transfer to any of fifty-seven entry

level jobs in every line of progression in each seniority division. The program further provides that these transfers are to be effective without reduction in the transferring employees' wage rate and that they will take their seniority with them. The sole conditions of transfer are that a vacancy exist in the job to which transfer is sought and that the employee seeking transfer be qualified to perform the job sought.

Pursuant to the transfer program, forty-seven out of ninety-three employees in the cleaner and maintenance jobs who submitted transfer request forms have been moved to jobs in other seniority divisions. All of such employees have retained their rate of pay, with the result that all but one of them is earning an hourly wage in excess of that they would have earned but for the special rights provided by the transfer program. All of such employees will be promoted and downgraded in the future on the basis of a comparison of their plant-wide seniority with other employees, white and Negro, similarly situated.

Of the remaining forty-six employees who submitted transfer request forms, seventeen have subsequently rejected transfer to jobs selected for transfer, and twenty-three have selected jobs which have not become vacant since the inception of the program and which will be offered to such employees when they become vacant.[3]

### IV

Attacking the transfer program, the plaintiff alleges that it is operating in violation of Title VII and will irreparably injure those employees who are the intended beneficiaries of it.

The court will consider separately the plaintiff's basic contentions of irrepara-

ble injury and the evidence relating to each such allegation.

(1) The plaintiff's first contention is that some twenty-five Negro employees who have transferred to the Beginner jobs in the General Mechanic line of progression and the Sheet Metal line of progression are subject to a risk of layoff to which other employees with comparable seniority in the higher rated jobs in these lines of progression are not subject.

The court will assume, for the purpose of the motion for preliminary injunction, that in cases of a reduction in the work force, employees in Beginner jobs are subject to layoff before employees in the higher rated jobs.[4] But so assuming, the court cannot accept the thesis that the employees who have transferred pursuant to the transfer program are in the position argued by the plaintiff. On the contrary, with the KC–135 contract in the process of active build-up, there is no credible evidence from which to infer or even speculate that there is a likelihood of a layoff in the General Mechanic or the Sheet Metal lines of progression within the period of time that the Negro employees in question will remain in the Beginner jobs.

The Negro employees who have transferred to these Beginner jobs will, as a matter of right, be automatically promoted at the end of twenty-four weeks of service in the Beginner jobs to the higher rated jobs in their lines of progression, and this is so without regard to the need or lack of need for employees in the higher rated jobs.

The result of the automatic promotion rule, together with the present and anticipated strength of the work force, is that the Negro employees who have transferred to the Beginner jobs in the General Mechanic and Sheet Metal lines

---

3. Six employees have been disqualified for jobs they selected for transfer either for medical reasons or lack of qualifications. There is no evidence in the record that any of these disqualifications was without justification.

4. Since there was testimony regarding layoffs in some higher rated jobs while employees in Beginner jobs are retained, this is an assumption for purposes of the present motion only.

of progression will, no later than the end of twenty-four weeks of service in such jobs, be promoted and protected against layoff in accordance with their length of continuous service with the Company.

The plaintiff's contention that these employees have been subjected to a discriminatory risk in employment security is for these reasons without foundation.

(2) The plaintiff's second contention is based on the "remanning" provision of the collective bargaining agreement, under which an employee who has been laid off or downgraded due to a reduction in the work force is entitled to return to a higher rated job which he has previously performed satisfactorily before other employees are promoted to such job. Plaintiff insists that because of this provision, employees working in the higher rated jobs in the lines of progression to which the Negro employees were transferred will be entitled to jobs in the line in preference to such Negro employees.

■ This contention is supportable only by considerable speculation with regard to the alignment of a host of variables in the future. The court has carefully considered manpower projections, current and past seniority rosters, and the employment history of employees in the production and maintenance unit in light of the plaintiff's argument. On the basis of this evidence, the court finds that employees who could conceivably have remanning rights over the Negro employees transferred to the Beginner jobs before they are eligible for promotion to higher rated jobs will have such rights only as a result of long years of experience in their lines of progression. Without detailing the evidence on this point, the sum total is that employees with some fifteen years' experience in jobs in the General Mechanic and Sheet Metal lines of progression might be benefited by the remanning provision by being entitled to return to jobs they have held before employees with fifteen years less relevant experience are promoted to such jobs. That this remote possibility exists is not a basis on which the court should properly issue an injunction negating the operation of the remanning provision.

(3) The plaintiff's third contention is that the transfer program is irreparably injuring those Negro employees who did not exercise their privilege to transfer.

■ However, the evidence before the court compels the conclusion that the employees who elected not to take advantage of the transfer privileges offered to them have done so either because they preferred the work of their jobs or because they believed that their seniority would better protect them from layoffs in their present seniority division.[5]

(4) The plaintiff's final contention is that the administration of the transfer program was beset with confusion and that the employees misunderstood their opportunities thereunder.

■ That simply isn't so. The testimony of the witnesses, both for the plaintiff and the Company, showed the fact to be that the most meticulous attention was devoted to administering the transfer program and to explaining to the Negro beneficiaries their rights thereunder, both in group meetings and in conferences with individual employees.

V

The court is further of the opinion that it would require a departure from the applicable law on the subject to treat the transfer program as a violation of the rights of the Negro employees of the Company.

The leading authority is the decision of our court of appeals in Whitfield v. United Steelworkers of America, 263 F. 2d 546 (5th Cir. 1959), cert. denied, 360 U.S. 902, 79 S.Ct. 1285, 3 L.Ed.2d 1254 (1959), which concerned a procedure by

---

5. The record shows that employees in the cleaner and maintenance jobs have sub-stantial seniority against layoffs as compared with other employees in the plant.

which Negro employees could transfer from previously segregated lines of progressions to entry level jobs in lines of progression which had previously been restricted to white employees. Rejecting the claim that the requirement of transferring to entry level jobs perpetuated racial discrimination, the court spoke through Judges Hutcheson, Rives, and Wisdom as follows:

> "An employee without the proper training and with no proof of potential ability to rise higher, cannot expect to start in the middle of the ladder, regardless of plant seniority. It would be unfair to the skilled, experienced, and deserving employee to give a top or middle job to an unqualified employee. It would also destroy the whole system of lines of progression, to the detriment of efficient management and to the disadvantage of negro as well as white employees having a stake in orderly promotion."

The subject of transfer rights was similarly at issue in Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va. 1968). There, the court expressed the opinion that the *Whitfield* case was applicable under Title VII with respect to transfers to jobs which required skill and training.[6] From the evidence before the court on the present record, such is the case with respect to the higher rated jobs under consideration here.

■ The provisions of Title VII, as any student of the legislative history will discover, are the product of an extended and careful consideration of the rights not only of Negroes but of other employees in the light of the complex realities of industrial life. The statute was not intended to accord privileges to Negro employees in blind disregard of the seniority rights of others, and it was not intended to be administered in disregard of the interest of employers in efficiency and ability.

■ As aptly put by Judge Meredith of the Eastern District of Missouri in another section 707 case, United States v. Sheet Metal Workers International Association, 280 F.Supp. 719 (E.D.Mo. 1968):

> "The Civil Rights Act of 1964 was not intended to penalize unions or others for their sins prior to the effective date of the Act. It is prospective only. Neither was it passed to destroy seniority rights in unions or in business. The Act specifically forbids a union or a business from giving preferential treatment to Negroes to correct an existing imbalance of whites."

The fact that Title VII contemplates and requires a triangular adjustment of the rights of minority group employees, the rights of other employees, and the interest of management and labor is abundantly clear and indisputable. Here, as in the *Whitfield* case, the transfer program at issue has, in the considered opinion of the court, resolved this triangular adjustment in an entirely fair and nondiscriminatory manner.[7]

## VI

In sum total, then, the court finds that the employees with respect to whom the plaintiff alleges irreparable injury have in fact been accorded by the transfer program the opportunity to take advantage of special and unequal advan-

---

6. While the rationale of *Whitfield* may be substantially eroded by future cases arising under Title VII, its caveat that "fairness is not achieved by treating the white incumbents unfairly", 263 F.2d at 550, should remain a polestar to guide the courts through yet uncharted seas.

7. Thus, this case is clearly distinguishable from United States v. Local 189, United Papermakers & Paperworkers, 282 F. Supp. 39 (E.D.La.1968) where the holdings of the court emanated from the finding that the company and the union there had "actively engaged, prior to January, 1966, in a pervasive pattern of discrimination."

tages which have never been accorded any other employee. The court is accordingly firmly of the opinion, and so holds, that the plaintiff's motion for preliminary injunction is to be denied.[8]

---

8. In ruling on this motion the court has carefully refrained from discussing, or expressing an opinion on, the merits of all the issues tendered by the pleadings, which await determination on a full record after final hearing. For this reason the court has pretermitted a critical analysis of the several remedies proposed by the plaintiff.