Douglas QUARLES and Ephriam Briggs

v.

PHILIP MORRIS, INCORPORATED, a Virginia corporation, Local 203 of the Tobacco Workers International Union, an unincorporated association, Wallace Mergler, President of Local 203 of the Tobacco Workers International Union, Defendants.

Civ. A. No. 4544.

United States District Court
E. D. Virginia,
Richmond Division.

Jan. 4, 1968.

See also, D.C., 271 F.Supp. 842.

1963); Nat'l Materials Co. v. Guest, 147 So. 771 (Ct. of App. La.1933).

Henry L. Marsh, III, Hill, Tucker & Marsh, Richmond, Va., Jack Greenberg, Leroy D. Clark, New York City, for plaintiffs.

Edward F. Butler, Conboy, Hewitt, O'Brien & Boardman, New York City, Lewis T. Booker, Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., for Philip Morris, Incorporated.

Beecher E. Stallard, Richmond, Va., for Local 203 of the Tobacco Workers International Union.

Kenneth F. Holbert, Acting Gen. Counsel, Russell Specter, David R. Cashdan, Washington, D. C., Attys., for Equal Employment Opportunity Commission, amicus curiae.

## MEMORANDUM OF THE COURT

BUTZNER, Circuit Judge (by designation).

Douglas H. Quarles, plaintiff, and Ephriam Briggs intervening plaintiff, Negro employees of Philip Morris, Inc., and members of Local 203 of the Tobacco Workers International Union, brought this action on their own behalf and on behalf of other Negroes similarly situated, against the company, the union and the president of the union, to enjoin them from violating Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.). Quarles sued the company; upon Briggs' intervention, the union and its president were joined as defendants.

The plaintiffs alleged that the defendants by their employment practices and collective bargaining agreement refused to hire, promote to supervisory positions, pay, advance and transfer Negro employees on the same basis as white employees. The plaintiffs do not seek back wages.

The court previously ruled that the plaintiffs, having stated a cause of action that met the prerequisites of Fed. R.Civ.P. 23(a), could maintain this suit as a class action, and that the parties opposing the class have acted or refused to act on grounds generally applicable to the class, making relief appropriate to the class [Fed.R.Civ.P. 23(b) (2)]. The effect of the court's ruling was to hold that each member of the class was not required to pursue administrative relief for the correction of the same employment practices.

The court also denied the defendants' motion to dismiss on the ground that the Equal Employment Opportunity Commission did not endeavor to conciliate the claim of the individual plaintiffs prior to the institution of the suit. The court found that Quarles made complaint against the company to the commission, and Briggs complained against the company and the union. They were notified the conciliation efforts of the commission had not achieved compliance with the act. The court ruled that Quarles and Briggs had done all within their power to exhaust administrative remedies. Quarles v. Philip Morris, Inc., 271 F.Supp. 842 (E.D.Va.1967). See Stebbins v. Nationwide Mutual Ins. Co., 382 F.2d 267, 268 (4th Cir. 1967); Mickel v. South Carolina State Employment Service, 377 F.2d 239, 242 (dictum) (4th Cir. 1967). Quarles made no complaint against the union, but the omission is not fatal. The main thrust of his case is against the employment practices of the company. Briggs complained against the company and the union, thus making proper the joinder of the union as a defendant. The plaintiffs have not stated, or proved, a cause of action against Wallace A. Mergler, President of Local 203. He will be dismissed.

Upon the merits of the case the court holds:

I. The company has not engaged in discriminatory hiring practices since January 1, 1966, and consequently, the plaintiffs are not entitled to relief on this issue;

II. The company has not discriminated on racial grounds with respect to employment and promotion of supervisory personnel;

III. The company has discriminated on the grounds of race with respect to the pay of two employees, Ephriam Briggs and Mrs. Lillie J. Oatney; the plaintiffs have failed to establish discrimination against Negroes as a class with respect to pay;

IV. The defendants have discriminated against Douglas R. Quarles and the class consisting of Negro employees who were hired in the prefabrication department before January 1, 1966, with respect to advancement, transfer, and seniority. The plaintiffs are entitled to relief correcting this discrimination.

## I.

The company's cigarette and tobacco manufacturing operations in Richmond, are divided into four general departments: (1) green leaf stemmery, a seasonal operation; (2) prefabrication; (3) fabrication; and (4) warehouse shipping and receiving. (A fifth department—gum—presents no issues.) Before 1955, with a minor exception, Philip Morris employed Negro and white persons on a segregated basis. Negroes only were employed in the stemmery and prefabrication departments. White persons only were employed in the fabrication department. The warehouse shipping and receiving department was predominantly white with a few Negroes. In 1955, as a result of a Presidential Executive Order prohibiting discrimination by government contractors, the company assigned thirteen Negro employees to the fabrication department.

On May 1, 1961 the company established a "Factories Employment Policy" to comply with a Presidential Executive Order requiring employment and promotion without regard to race. The policy achieved only token employment of Negroes in the fabrication and warehouse shipping and receiving departments. The stemmery and prefabrication departments remained predominantly Negro.

During the years 1961–1965, the company's total work force exceeded 2,000 persons, of which Negroes constituted 25 to 31 per cent. In 1961 and 1962 no Negroes were hired in the fabrication department. Negroes constituted 1.9 per cent of the persons hired in that department in 1963, 6.5 per cent in 1964, and 4.1 per cent in 1965. The pattern of hiring in the warehouse shipping and receiving department was substantially the same. Title VII of the Civil Rights Act of 1964 became effective July 2, 1965. The company, however, did not significantly change its hiring practices. For example, of those employees remaining on the payroll as of April 30, 1967, 41 of the 43 persons hired in the fabrication department from July 2, 1965 to November 8, 1965 were white.

In sharp contrast to the token hiring of Negroes in fabrication for 1965 and prior years, Negroes constituted 32.6 per cent of the persons hired in this department in 1966 and 29.5 per cent through the first four months of 1967. As of April 1967, 14 per cent of the employees in the fabrication department were Negroes, 12.9 per cent in the warehouse shipping and receiving department were Negroes, and the percentage of Negroes in the stemmery and prefabrication departments, while still large, had been reduced.

■ The court holds that since January 1, 1966, the company has not discriminated on the grounds of race in its hiring policy. The court concludes, regardless of practices before January 1, 1966, that relief on this issue is not now appropriate.

## II.

■ The plaintiffs failed to introduce evidence proving their allegation that the company discriminated on racial grounds with respect to employment and promotion of supervisory personnel. The plaintiffs point to the small number of Negro supervisory employees in comparison with the large number of white supervisors. (7 Negroes, 243 white, as of February 9, 1967). But the plaintiffs have not shown any instance of a qualified Negro being denied employment or promotion to a supervisory position.

Negroes have been appointed foremen in the stemmery, the blended leaf section, the wrapping section and the storage and dressing section of the company's 20th Street plant. Other Negroes have been placed as an export superintendent and in the quality control sections. The company has recruited Negroes from colleges to enter its management trainee program. Negroes are employed at the executive level in the sales organization.

The court concludes that relief on this issue is not appropriate.

## III.

Racially segregated local unions formerly were bargaining agents for the employees. Local 203 had exclusive jurisdiction over the jobs in the fabrication and warehouse shipping and receiving departments. Its membership consisted of white employees. Local 209, the bargaining agent for the Negro employees, had exclusive jurisdiction over jobs in the prefabrication department and stemmery. These local unions merged in September 1963 to comply with a Presidential Executive Order. Local 203 now represents all employees. Its present bargaining committee includes both white and Negro employees.

Before 1957 the wage rates the company negotiated with each local were unequal for the same work performed. Generally Negroes' wages were lower. For example, Negro elevator operators in the prefabrication department were paid less than white elevator operators in the fabrication department. These wages were equalized in 1959. In the warehouse shipping and receiving department, which was under the jurisdiction of Local 203, the white union, rates for entry level jobs were lower for the few Negro employees than for white employees. These rates were equalized in 1957.

Long ago there appears to have been one wage rate for employees in the prefabrication department. For many years, however, the company has recognized that certain jobs require more skill and responsibility than others. These were called key jobs, and the employees who filled them were paid $2.37 or $2.42 an hour as distinguished from the general labor rate of $2.22. In prefabrication there are approximately 47 key jobs. Since prefabrication was a Negro operation at the time the key jobs were established, the key jobholders were Negroes. Negroes who checked receipt of raw materials and delivery of supplies and products in the warehouse shipping and receiving department were also classified as key jobholders.

Generally, the company has eliminated all vestiges of unequal wages for white and Negro employees. Two exceptions, however, have been established.

■ Ephriam Briggs holds the key job of casing attendant. This job has always been filled by a Negro working in the prefabrication department. Briggs has been employed by the company for twelve years and has been a casing attendant since 1959 or 1960. He is paid $2.42 an hour. Briggs applies various flavors to the tobacco according to the brand of cigarettes to be manufactured. He must dilute the flavors, adjust for heat and moisture, and constantly observe a number of controls. At six-minute intervals he records his readings in a logbook. The court finds that this job is comparable at least to a basic machine operator's position which pays $2.55 per hour in the fabrication department. Both Briggs and the operator are doing work which requires substantial training and experience. Both are subject to supervision, and neither is expected to perform major repairs. Both have considerable responsibility with respect to the equipment and raw material with which they work. Briggs' working conditions are far less desirable than a machine operator's. √Comparisons with other tobacco factories cannot be exact because of differences in job descriptions. However, a rate of $2.55 per hour for Briggs would not be out of line with the $2.61 rate for a casing operator at Liggett & Myers' Richmond, Virginia, factory. The court finds that Briggs' wages are a vestige of the old policy under which Negroes were paid less than white persons for work requiring substantially equal responsibility.

■ The evidence is plain that the disparate rates between Briggs' job as casing attendant and the comparable job of basic machine operator in the fabrication department exist because one position was reserved for a Negro and the other for a white person. Briggs' rate of pay was not determined through work analysis and evaluation of all jobs throughout the plant but solely through comparison of his job with jobs held only by Negroes. The fact that Briggs, at

the last contract negotiations, asked for and received an additional 5 cents per hour to bring his wage from $2.37 per hour, the key job rate, to $2.42, does not establish that the act has not been violated.

Mrs. Lillie J. Oatney, a Negro, has been employed by the company for twenty-nine years. Her present job classification is "tag meter" in the prefabrication department at a rate of $2.21 per hour. She has held this job seventeen years. She takes samples of tobacco from a merry-go-round which is a part of the equipment used to mix cigarette tobacco. She uses a meter to measure the moisture in the sample, announces her observations over an intercom system, and makes a written record. She must know the proper reading for each blend of tobacco and the proper method of operating the moisture meter. She takes approximately fifteen readings every thirty minutes.

A white employee in the fabrication department also measures the moisture in tobacco and uses the same equipment as Mrs. Oatney. His rate of pay is $2.55 per hour. He gets his tobacco samples from cigarette-making machines. However, this does not materially increase the responsibility or the difficulty of his job. The white moisture tester relieves the stock clerk during lunch time. He does not perform the work of the clerk and is not familiar with the operation of the stock room. White moisture testers are transferees from operators' jobs. They are not, however, required to work as operators and the testimony does not disclose that operating skill is required for the job. The discrimination between the pay of the "tag meter" in the prefabrication department and the "moisture tester" in the fabrication department is another vestige of the racial segregation that characterized the departments for many years.

Section 703(a) of the Civil Rights Act of 1964 [42 U.S.C. § 2000e-2(a)] provides in part:

"It shall be an unlawful employment practice for an employer—

"(1) * * * to discriminate against any individual with respect to his compensation * * * because of such individual's race * * *."

The court finds that the company's discrimination against Briggs and Mrs. Oatney is an intentional, unlawful employment practice. Relief under § 706(g) [42 U.S.C. § 2000e-5(g)] bringing their wage rates to $2.55 per hour is appropriate. Back pay is not an issue.

The pay of a number of Negro key job-holders was set because the work they did was more difficult or responsible than the work of other Negroes in the prefabrication department. The pay of these key jobholders was not fixed by comparing their work with duties performed by white persons in other departments. The evidence, however, does not disclose that Negro key jobholders in the prefabrication and warehouse shipping and receiving departments, or that Negroes as a class, receive lower wages than white employees doing substantially similar work.

The court finds the company has not intentionally engaged in an unfair employment practice with respect to the wages it pays Negro employees, except Briggs and Mrs. Oatney. The plaintiffs' prayer that the wages of all Negro employees be adjusted is denied.

## IV.

The final issue is whether the restrictive departmental transfer and seniority provisons of the collective bargaining agreement are intentional, unlawful employment practices because they are superimposed on a departmental structure that was organized on a racially segregated basis. It raises the question: Are present consequences of past discrimination covered by the act? A perceptive analysis of the problem and its solution, upon which the court has freely drawn, may be found in Note, Title VII, Seniority Discrimination, and the Incumbent Negro, 80 Harv.L.Rev. 1260 (1967).

Consideration of this issue requires familiarity with the operation of the company's business in Richmond, Virginia. The company manufactures a variety of products in its Richmond plants. Cigarettes are produced for marketing under nine different brand names. Each brand has its own distinctive blend of tobaccos and flavor formulas. The cigarettes vary in size, type, packaging and labeling. Seven major blends and 125 private blends of smoking tobacco are produced, blended and packaged. The company operates a number of plants whose functions are:

*Green leaf stemmery, or the stemmery.* Here tobacco from the current domestic crop is tipped and thrashed to separate the stems. It is prized in hogsheads for storage. This seasonal operation spans the months from July to March.

*Dock Street plant.* Imported leaf tobacco is stored in bond, withdrawn from storage, processed, blended and shipped to the cigarette and smoking tobacco factories.

*Blended leaf plant.* Stems and scrap tobacco collected at other locations are regenerated.

*Stockton Street plant.* Tobacco ready for processing is received in bulk and manufactured into cigarettes, which are then packaged and wrapped as finished consumer goods.

*20th Street plant.* This plant performs the same functions as the Stockton Street plant.

*19th Street smoking tobacco factory.* Tobacco in bulk is manufactured into pipe blends, which is packaged and wrapped as finished consumer goods.

*Warehouse.* This is a storage facility for manufacturing supplies and a depot for inventory of finished products.

Rates of pay, job progression, transfer, and seniority of employees are covered by two collective bargaining agreements between the company and Local 203. The first agreement covers all permanent employees engaged in manufacturing tobacco products. It is known as the main contract. The second, or supplemental agreement, covers seasonal employees operating the stemmery. These contracts were negotiated in the fall of 1964. They took effect February 1, 1965 for a three-year period expiring January 31, 1968. On March 7, 1966 a "Memorandum of Understanding" modified seniority and transfer clauses.

Employees represented by Local 203 are assigned to four separate departments, each of which has its own job progression ladder and its own seniority roster. These departments are:

1. *Green leaf stemmery.* Seasonal employees work here under five job classifications ranging in pay from $1.85 to $2.05 per hour. Employees can qualify for a 15 per cent attendance bonus. Formerly all employees were Negro. As of mid-February 1967, 206 people were employed. 79.6 per cent were Negro.

2. *Prefabrication department.* Employees process tobacco in bulk at Dock Street, the blended leaf plant, Stockton Street, 20th Street and 19th Street. Thirteen job classifications range from tag meter at $2.21 per hour to fixer at $3.44 per hour. The entry level classification is laborer at $2.22 per hour. All janitors working in both the prefabrication and fabrication areas of the several plants are assigned to the prefabrication department. The department formerly was staffed only with Negroes. As of April 30, 1967, 430 persons were employed, of which 90.5 per cent were Negroes.

3. *Fabrication.* This department consists of employees who make and pack cigarettes and smoking tobacco. They work at Stockton Street, 20th Street, and 19th Street. There are forty-four ratings in the department, ranging from matron at $2.09, to head fixer at $3.63 an hour. The entry level classification is "miscellaneous" at $2.30 per hour. Above the level of miscellaneous, the department is subdivided into making and packing sub-departments. The company provides on the job training to teach employees how to operate cigarette-making machines. Painters and air conditioner repairmen are assigned to the fabrication

department regardless of where they work. The factory clerk and watchman are other fabrication job classifications regardless of where the work is done. Formerly only white employees worked in the department. As of April 30, 1967, 1,933 people were employed in this department, of whom 14 per cent were Negroes.

4. *Warehouse receiving and shipping department.* Employees handle the inventory of finished products and manufacturing supplies other than leaf. There are five ratings, ranging from general warehouse at $2.41 per hour, the entry level rate, to tractor-trailer driver at $2.68 per hour. Below the level of truck driver ($2.58 per hour), the department is subdivided into shipping and receiving sub-departments. Employees work at Stockton Street, 20th Street, and the warehouse. This was formerly a predominantly white department, although it always had a few Negroes. As of April 30, 1967, it had 70 employees, of whom 12.9 per cent were Negroes.

Employees are hired from the street into all of the departments except prefabrication. Applicants are tested at the State Department of Labor. The collective bargaining agreement provides that vacancies in the prefabrication department shall be filled by senior employees from the stemmery.

Job classifications in each department are ranked in definite order for purposes of determining progression. The rate of compensation is greater for the upper positions. Employees generally are hired only for entry level positions within each department. The higher rated jobs are filled by advancement based on departmental seniority, merit and ability. Usually the employee with the longest departmental seniority is given the opportunity to prove his ability by on the job training if his work record is acceptable and he has no obvious physical or mental disqualifications. If he fails to perform adequately after a reasonable time, he is down-graded to a job he can perform. Generally, advancement is only within the department where the employee works, and in some instances only within a sub-department.

For many years interdepartmental transfers were prohibited. Provisions for transfers, applicable alike to all races within each department, are now included in the collective bargaining agreements. The modes of transfer are:

1. *The six months agreement.* Originally this was negotiated in 1950 for the purpose of allowing white employees in outlying areas to transfer to operator's jobs in fabrication. Negroes in the prefabrication department were not permitted to transfer until 1961, when two Negro employees were allowed to transfer every six months.

Since March 1966, four transfers every six months from prefabrication and two every six months from warehouse shipping and receiving have been permitted to the fabrication department for basic machine operator's jobs ($2.55 per hour), when vacancies occur. Applicants compete on the basis of employment date seniority, merit and ability with all other eligible candidates. Successful applicants are transferred to the fabrication seniority roster with seniority dating from the date of their permanent employment. This means that departmental and employment date seniority are the same. They have no return rights to their previous departments.

2. *Note of intent transfers to fabrication.* Transfers at the discretion of management are allowed from prefabrication and the stemmery to any qualified employee who requests it and is recommended by his supervisor to an entry level job in fabrication when vacancies occur. The transferee's seniority in fabrication is measured from the date of transfer. In the event of layoff the employee can return to his previous department with his employment date seniority unimpaired.

3. *Note of intent transfers to warehouse shipping and receiving.* Transfer of one employee each month where vacancies exist has been permitted since March 1966 from prefabrication to basic labor

jobs in warehouse shipping and receiving. Seniority in warehouse shipping and receiving is measured from the date of transfer. In the event of layoff, an employee can return to his previous department with seniority there unimpaired.

The transfer plans clearly show the difference between employment seniority, which indicates the date on which the employee was first permanently employed by the company, and departmental seniority, which indicates the date on which the employee started to work in a particular department. Most of the opportunities for advancement or for exercising other privileges depend upon departmental seniority rather than employment seniority. Departmental seniority is generally a factor in competition for transfer, promotion, preferential day shifts and avoiding layoffs.

Operation of the company's business on departmental lines with restrictive departmental transfers serves many legitimate management functions. It promotes efficiency, encourages junior employees to remain with the company because of the prospects of advancement, and limits the amount of retraining that would be necessary without departmental organization. On the other hand, organization of the departments on a racially segregated basis has prevented Negroes from advancing on their merits to jobs open only to white persons. Employment without regard to race since January 1966 and the relaxation of departmental transfers has only partly eliminated this disadvantage.

The present discrimination resulting from historically segregated departments is apparent from consideration of the situation of a Negro who has worked for ten years in the prefabrication department. In 1957 because of his race he could not get a job in the fabrication department, where the better paying jobs are. The six months agreement for transfers was unavailable to him until 1961, and then regardless of his qualifications and the vacancies, only two Negroes could transfer every six months. In competing for a transfer he had to have higher employment seniority than other employees in his department who sought transfer. This condition exists today with the single exception that four transfers are allowed from prefabrication every six months. In contrast, the opportunities of a white employee who was hired nine years ago are considerably better than the Negro with ten years employment seniority. The white employee, because of his race, could start to work in the fabrication department. His opportunities for advancement are not limited to four vacancies every six months and he does not have to compete for transfer with persons who have greater employment seniority.

The other method of transfer—note of intent—did not become available to a Negro in the prefabrication department until 1963. This method requires the transferee to sacrifice his employment seniority and take new departmental seniority based on his transfer date. Thus a Negro with ten years employment seniority transferring under a note of intent from the prefabrication department to the fabrication department takes an entry level position with departmental seniority lower than a white employee with years less employment seniority. These restrictions upon the present opportunities for Negroes result from the racial pattern of the company's employment practices prior to January 1, 1966. The restrictions do not result from lack of merit or qualification. A transferee under any plan must satisfy ability and merit requirements regardless of his seniority.

The plaintiff, Douglas H. Quarles, has been employed by Philip Morris for nine years. He is a laborer in the prefabrication department earning $2.22 per hour. He sought a job as a truck driver, which pays $2.58 an hour, in the warehouse shipping and receiving department, where eight or ten truck drivers are assigned. A Negro has never been employed as a permanent truck driver, but at the time the suit was heard, one Negro was a temporary driver. An employee does not need to ascend the ladder of progression in the department to get a truck driver's

job. He must have merit, ability and seniority within the department to bid successfully. In July 1964, Quarles spoke with the director of personnel, requesting a job as a truck driver. He again sought employment in mid-July 1965 and the director indicated he would not get the job. Quarles was not denied the job for lack of ability. There was no provision in the collective bargaining agreement that would allow him to transfer from the prefabrication department, where approximately 92 per cent of the employees were Negro, to the warehouse shipping and receiving department, where approximately 88.1 per cent were white. Upon Quarles' complaint, the Equal Employment Opportunity Commission found reasonable cause to believe that the restrictions placed on this transfer violated the Civil Rights Act of 1964. Not until March 7, 1966 did the company and the union amend the collective bargaining agreement to allow employees to transfer from prefabrication under a note of intent at the rate of one a month when vacancies exist to basic labor jobs in warehouse shipping and receiving. This provision would not get Quarles a truck driving job because he would be required to give up his employment seniority and take departmental seniority in the warehouse shipping and receiving department as of the date of transfer. He would find himself junior to white employees holding less employment seniority who got their positions by reason of the company's former racially segregated employment policy. Quarles was offered an opportunity to transfer by note of intent after his suit was instituted. He declined because he did not wish to sacrifice his seniority.

The plaintiffs contend that Quarles and other Negroes hired before January 1, 1966 are deprived of opportunities to advance because of their race. They do not seek to oust white employees with less employment seniority from their jobs, but they do seek to be trained and promoted to fill vacancies on the same basis as white employees with equal ability and employment seniority.

Pertinent provisions of Title VII of the Civil Rights Act of 1964 are:

Section 703(a), 42 U.S.C. § 2000e–2 (a):

"It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

Section 703(c), 42 U.S.C. § 2000e–2 (c):

"It shall be an unlawful employment practice for a labor organization—

"(1) to exclude or to expel from its membership or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

"(2) to limit, segregate, or classify its membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

"(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section."

Section 703(d), 42 U.S.C. § 2000e–2 (d):

"It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management

committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training."

The company and the union contend that the present departmental seniority system is not unlawful because it limits on a nondiscriminatory basis the transfer privileges of individual Negroes assigned to the prefabrication department years ago pursuant to a policy of segregation which has long since been abolished. This point is crucial to the defendants' case. It is based upon the proposition that the present consequences of past discrimination are outside the coverage of the act. The defendants rely on legislative history to sustain their thesis; the text of the act does not support it. The plain language of the act condemns as an unfair practice all racial discrimination affecting employment without excluding present discrimination that originated in seniority systems devised before the effective date of the act. The principal excerpts of the legislative history which the defendants cite are:

"This bill is not an instrument to abolish seniority or unions themselves, as some have charged. The only standard which the bill establishes for unions and management alike is that race will not be used as a basis for discriminatory treatment * * *." 110 Cong. Rec. 6549 (1964) (remarks of Senator Humphrey).

　　*　　*　　*　　*　　*　　*

"Neither would seniority rights be affected by this Act. Employers and labor organizations could not discriminate in favor of or against a person because of his race, his religion, or his national origin * * *." 110 Cong. Rec. 6564 (1964) (remarks of Senator Kuchel).

　　*　　*　　*　　*　　*　　*

"First, it has been asserted that Title VII would undermine rights of seniority. This is not correct. Title VII would have no effect on seniority rights existing at the time it takes effect. If, for example, a collective bargaining contract provides that in the event of layoffs, those who were hired last must be laid off first, such a provision would not be affected in the least by Title VII. This would be true even in the case where owing to discrimination prior to the effective date of the title, white workers had more seniority than Negroes. Title VII is directed at discrimination based on race, color, religion, sex or national origin. It is perfectly clear that when a worker is laid off or denied a chance for promotion because under established seniority rules he is 'low man on the totem pole' he is not being discriminated against because of his race. Of course, if the seniority rule itself is discriminatory, it would be unlawful under Title VII. If a rule were to state that all Negroes must be laid off before any white man, such a rule could not serve as the basis for a discharge subsequent to the effective date of the title. I do not know how anyone could quarrel with such a result. But, in the ordinary case, assuming that seniority rights were built up over a period of time during which Negroes were not hired, these rights would not be set aside by the taking effect to Title VII. Employers and labor organizations would simply be under a duty not to discriminate against Negroes because of their race. Any differences in treatment based on established seniority rights would not be based on race and would not be forbidden by the title." Department of Justice Memorandum presented by Senator Clark on April 8, 1964, Bureau of National Affairs Operations Manual, The Civil Rights Act of 1964, p. 326.

　　*　　*　　*　　*　　*　　*

"Mr. President, it is clear that the bill would not affect seniority at all. It would not affect the present opera-

tion of any part of the National Labor Relations Act or rights under existing labor laws. The suggestion that racial balance or quota systems would be imposed by this proposed legislation is entirely inaccurate." Statement by Senator Clark on April 8, 1964, Bureau of National Affairs Operations Manual, The Civil Rights Act of 1964, p. 327.

\*   \*   \*   \*   \*   \*

"Title VII would have no effect on established seniority rights. Its effect is prospective and not retrospective. Thus, for example, if a business has been discriminating in the past and as a result has an all-white working force, when the title comes into effect the employer's obligation would be simply to fill future vacancies on a nondiscriminatory basis. He would not be obliged —or indeed, permitted—to fire whites in order to hire Negroes, or to prefer Negroes for future vacancies, or, once Negroes are hired, to give them special seniority rights at the expense of the white workers hired earlier. (However, where waiting lists for employment or training are, prior to the effective date of the title, maintained on a discriminatory basis, the use of such lists after the title takes effect may be held an unlawful subterfuge to accomplish discrimination.") Interpretative Memorandum of Senators Clark and Case, Bureau of National Affairs Operations Manual, The Civil Rights Act of 1964, p. 329.

\*   \*   \*   \*   \*   \*

"Question. Would the same situation prevail in respect to promotion, when that management function is governed by a labor contract calling for promotions on the basis of seniority? What of dismissals? Normally, labor contracts call for 'last hired, first fired'. If the last hired are Negroes, is the employer discriminating if his contract requires that they be first fired and the remaining employees are white?

"Answer. Seniority rights are in no way affected by the bill. If under a 'last hired, first fired' agreement a Negro happens to be 'last hired', he can still be 'first fired' as long as it is done because of his status as 'last hired' and not because of his race.

"Question. If an employer is directed to abolish his employment list because of discrimination what happens to seniority?

"Answer. The bill is not retroactive, and it will not require an employer to change existing seniority lists." Senator Clark's answers to Senator Dirksen's questions, Bureau of National Affairs Operations Manual, The Civil Rights Act of 1964, p. 332.

Several facts are evident from the legislative history. First, it contains no express statement about departmental seniority. Nearly all of the references are clearly to employment seniority. None of the excerpts upon which the company and the union rely suggests that as a result of past discrimination a Negro is to have employment opportunities inferior to those of a white person who has less employment seniority. Second, the legislative history indicates that a discriminatory seniority system established before the act cannot be held lawful under the act. The history leads the court to conclude that Congress did not intend to require "reverse discrimination"; that is, the act does not require that Negroes be preferred over white employees who possess employment seniority. It is also apparent that Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the act.

These conclusions are buttressed by § 703(h) [42 U.S.C. § 2000e–2(h)], introduced as one of Senator Dirksen's amendments after the Senate debate:

"Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system

which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. \* \* \* "

Concerning this section, Senator Dirksen said:

"New subsection (h) provides that an employer may apply different standards of compensation, or different terms, conditions, or privileges of employment (1) pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production, or (2) to employees who work in different locations, provided that such differences are not the result of intention to discriminate because of race, color, religion, sex, or national origin." Bureau of National Affairs Operations Manual, The Civil Rights Act of 1964, p. 292.

Senator Humphrey added:

"A new subsection \* \* \* has been added, providing that it is not an unlawful employment practice for an employer to maintain different terms, conditions, or privileges of employment either in different locations or pursuant to a seniority, merit, or other incentive system, provided the differences are not the result of an intention to discriminate on grounds of race, religion, or national origin. For example, if an employer has two plants in different locations, and one of the plants employs substantially more Negroes than the other, it is not unlawful discrimination if the pay, conditions, or facilities are better at one plant than at the other unless it is shown that the employer was intending to discriminate for or against one of the racial groups. Thus this provision makes clear that it is only discrimination on account of race, color, religion, sex, or national origin, that is forbidden by the title. The change does not narrow application of the title, but merely clarifies its present intent and effect." Bureau of National Affairs Operations Manual, The Civil Rights Act of 1964, p. 302.

Section 703(h) expressly states the seniority system must be *bona fide*. The purpose of the act is to eliminate racial discrimination in covered employment. Obviously one characteristic of a *bona fide* seniority system must be lack of discrimination. Nothing in § 703(h), or in its legislative history, suggests that a racially discriminatory seniority system established before the act is a *bona fide* seniority system under the act.

The act went into effect on July 2, 1965. Until January 1, 1966 the company, with token exceptions, established its departmental seniority system on the basis of racial discrimination in its hiring policy. The departmental seniority lists which the company established before January 1, 1966 are still maintained by the company as their current lists. The court holds a departmental seniority system that has its genesis in racial discrimination is not a *bona fide* seniority system.

Section 703(h) also contains a *proviso* that touches upon the issue. It declares that it shall not be an unlawful employment practice for an employer to apply different standards pursuant to a *bona fide* seniority system " \* \* \* provided that such differences are not the result of an intention to discriminate because of race \* \* \*." The differences between the terms and conditions of employment for white and Negroes about which plaintiffs complain are the result of an intention to discriminate in hiring policies on the basis of race before January 1, 1966. The differences that originated before the act are maintained now.

The act does not condone present differences that are the result of intention to discriminate before the effective date of the act, although such a provision could have been included in the act had Congress so intended. The court holds that the present differences in departmental seniority of Negroes and white that result from the company's intentional, racially discriminatory hiring policy before January 1, 1966 are not validated by the *proviso* of § 703(h).

No case directly on point has been cited. The defendants rely primarily upon Whitfield v. United Steelworkers of America, Local No. 2708, 263 F.2d 546 (5th Cir. 1959), cert. den., 360 U.S. 902, 79 S.Ct. 1285, 3 L.Ed.2d 1254 (1959). There employees in a steel mill were divided into white and Negro lines of progression. The progression for white employees led to skilled jobs. The progression for Negro employees did not. In 1956 the company and the union reached an agreement which allowed Negroes to bid for positions in the white line as they became available, and all hiring was done into the Negro line without regard to race. A Negro bidding for a position in the white line had to pass a test demonstrating his ability to perform the job. White incumbents did not have to pass the test because they had been previously screened and subjected to 260 hours of probation. A Negro passing the test could transfer into the white line, but he went in at the bottom of the roster.

The court held that the agreement was not a violation of the union's duty fairly to represent employees required by Steele v. Louisville & Nashville R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). In reaching this decision, the court relied upon the fact that the white line consisted of a group of interrelated skilled jobs which did not overlap the Negro line. The court emphasized that an untrained Negro could not expect to start in the middle of the ladder, regardless of his seniority.

*Whitfield* does not stand for the proposition that present discrimination can be justified simply because it was caused by conditions in the past. Present discrimination was allowed in *Whitfield* only because it was rooted in the Negro employees' lack of ability and training to take skilled jobs on the same basis as white employees. The fact that white employees received their skill and training in a discriminatory progression line denied to the Negroes did not outweigh the fact that the Negroes were unskilled and untrained. Business necessity, not racial discrimination, dictated the limited transfer privileges under the contract.

Undoubtedly, *Whitfield* is applicable to the situation concerning supervisory employees at Philip Morris. Because of past discrimination, many Negroes, regardless of seniority, are not qualified for supervisory positions. The company cannot be required to promote them to supervisors to lessen the disproportion in the numbers of white and Negro persons holding these positions.

*Whitfield*, however, is not controlling with regard to the agreement reached by the company and the union on transfers and departmental seniority. Promotion to truck driver, the job which Quarles sought, does not depend upon progression from one classification to another in the warehouse shipping and receiving department. The only qualifications are ability to drive a truck, departmental seniority and being white. Employees, whether they be Negro or white, need training to operate a machine in the fabrication department.

While no case precisely on point appears to have been decided, the governing principles are not new. Present discrimination may be found in contractual provisions that appear fair upon their face, but which operate unfairly because of the historical discrimination that undergirds them. NLRB v. Local 269, IBEW, 357 F.2d 51 (3rd Cir. 1966). Departmental seniority rooted in decades of racially segregated departments can neither mask the duty of a union to fairly represent its members nor shield the employer who is privy to the union's derelictions. Central of Georgia Railway Co. v. Jones, 229

F.2d 648 (5th Cir. 1956), cert. den., 352 U.S. 848, 77 S.Ct. 32, 1 L.Ed.2d 59 (1956).

The court finds that the defendants have intentionally engaged in unlawful employment practices by discriminating on the ground of race against Quarles, and other Negroes similarly situated. This discrimination, embedded in seniority and transfer provisions of 'collective bargaining agreements, adversely affects the conditions of employment and opportunities for advancement of the class.

The parties have proposed various remedies that they deem appropriate under § 706(g) [42 U.S.C. § 2000e–5(g)], which provides in part:

"If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include reinstatement or hiring of employees, with or without back pay  *  *  *."

The plaintiffs suggest that the seniority rosters for the fabrication, prefabrication and warehouse shipping and receiving departments be merged according to employment seniority. They urge that Quarles be given the opportunity to fill the first vacancy for a truck driver and that Negro employees have an opportunity to fill the first vacancies in a number of jobs that previously have not been held by Negro employees.

The United States Equal Employment Opportunity Commission, *amicus curiae*, suggests that when a vacancy occurs in any department the vacancy should be posted in all departments. The bidding employee with the greatest employment seniority should receive the job, provided he has the ability and qualifications to do the work.

The company and the union, without prejudice to their defenses, suggest that every fourth vacancy occurring at the entry level in the fabrication department should be filled by senior employees in the prefabrication and stemmery departments. Qualified employees transferred to the fabrication department would achieve departmental seniority starting on the date of transfer.

None of these remedies is altogether satisfactory. The plaintiffs and the Commission would, in effect, abolish the departmental structure of the company's business. This drastic step is not required. No sound reason exists for compelling the company to forego the efficiencies which it has found in its departmental organization. Additionally, the plaintiffs' proposal, while not ousting white employees from present jobs, would prefer Negroes even though they might have less employment seniority than whites. Nothing in the act indicates this result was intended.

The proposals made by the company and the union would continue to subordinate Negroes to white employees regardless of employment seniority. For many Negroes, these proposals would result in a continuation of the racial discrimination caused by the company's hiring policies prior to January 1, 1966.

In fashioning a remedy the court must first determine the class of employees to which it is applicable. This is not difficult; it is fairly obvious from the evidence. The class includes all Negro employees hired in the prefabrication department before January 1, 1966. Prior to that date, the company's Factories Employment Policy operated on only a token basis and racial segregation in hiring was the practice, if not the rule.

Employees of the stemmery are not included in the class. They are seasonal employees hired on a temporary basis only. They do not attain permanent employment seniority unless they are hired as regular employees in another department. The company's experience with the generally poor quality of labor available on a seasonal basis provides a rational classification that distinguishes seasonal employees from permanent employees.

Negroes hired directly into the fabrication or warehouse shipping and receiving departments or who transferred under the six-months rule are not members of the class because no discrimination has been practiced against them. On the other hand, Negro employees who transferred under a note of intent to fabrication or to warehouse shipping and receiving are included because they were required to relinquish employment seniority, and were placed at a disadvantage with respect to white employees hired into these departments under the company's former discriminatory hiring policy.

Negroes hired after January 1, 1966 are not included in the class. Since that time the company has hired employees in all of its departments on a nondiscriminatory basis. Thus, even though Negro employees hired in the prefabrication department after January 1, 1966 have limited transfer privileges, these restrictions are not unfair employment practices. The departmental seniority status of Negroes hired after January 1, 1966 is predicated on a *bona fide* seniority system that did not result from an intention to discriminate on the ground of race.

■ The departmental seniority rights of white employees in the fabrication department are not vested, indefeasible rights. They are expectancies derived from the collective bargaining agreement, and are subject to modification. Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); Pellicer v. Brotherhood of Railway and Steamship Clerks, 217 F.2d 205 (5th Cir. 1954); cert. den., 349 U.S. 912, 75 S.Ct. 601, 99 L.Ed. 1246 (1955).

In Central of Georgia Railway Co. v. Jones, 229 F.2d 648, 649 n. 3 (5th Cir. 1956), cert. den., 352 U.S. 848, 77 S.Ct. 32, 1 L.Ed.2d 59 (1956), the court affirmed a decree that invalidated white and Negro lines of seniority, and enjoined the union and the company from enforcing contractual or operating practices which denied Negroes the right to compete and train for brakeman and other jobs. The decree affirmatively required the union and company to grant "the same seniority rights, training privileges, assignments, and opportunities to these jobs as white persons of similar continuous service would enjoy."

Here also the remedy should permit Negro employees in the class to train and advance on the same basis as white employees with comparable ability and employment seniority. At the same time, the remedy should disturb as little as possible the efficiencies which the company finds in its departmental structure.

■ The decree will provide that all Negroes hired by the company before January 1, 1966 who now work in the prefabrication department shall be given an opportunity to transfer to the fabrication or warehouse shipping and receiving departments to fill vacancies if they elect to transfer and if they are qualified for the jobs they seek.

Fifteen days after the entry of this decree the company shall serve on counsel for other parties and file Roster No. 1, showing the name of each Negro employee hired before January 1, 1966 who now works in the prefabrication department, together with his employment seniority date. Ten days after Roster No. 1 has been filed the company shall conduct a poll of the employees on Roster No. 1 to determine which ones elect to take advantage of opportunities to transfer to the fabrication or the warehouse shipping and receiving departments. A list (Roster No. 2) of those who have elected to take advantage of the opportunity shall be served on counsel and filed forthwith.

Roster No. 2 shall be screened to eliminate those who are disqualified for physical reasons or because they lack aptitude and ability to learn the work in the fabrication or warehouse shipping and receiving departments. The screening shall be conducted promptly by the personnel department of the company, which shall apply the same standards applied in hiring white employees for the fabrication and the warehouse shipping and receiving departments.

Roster No. 3 shall list the employees who have not been disqualified in the screening process, together with their employment seniority. It shall indicate whether each employee is qualified for transfer to fabrication or warehouse shipping and receiving, or both departments. After the screening, this roster shall be served forthwith and filed. At the same time the company shall file and serve upon counsel Rosters Nos. 4 and 5, consisting of the departmental seniority lists of employees in the fabrication and warehouse shipping and receiving departments, respectively. Commencing ten days after the filing of Rosters 3, 4 and 5, when a vacancy occurs in any job in the fabrication department, the vacancy is to be posted in the fabrication and the prefabrication departments. The bidding employee with the greatest seniority, on Rosters 3 and 4, whether he be white or Negro, is to receive the job provided he has the ability, merit and qualifications to do the work.

When a vacancy occurs in the warehouse shipping and receiving department, the vacancy is to be posted in the warehouse shipping and receiving department and the prefabrication department. The bidding employee with the greatest seniority, on Rosters 3 and 5, whether he be white or Negro, is to receive the job provided he has the ability, merit and qualifications to do the work.

Members of the class, transferred under these procedures, and members who previously transferred under a note of intent, shall have departmental seniority computed from their employment seniority date.

If any transferee fails to perform adequately within a reasonable time (not in excess of the normal probationary period of three months), he may be removed and returned to the department and job classification from which he came, or to another higher job classification for which the company may believe him fitted. His seniority will be computed from his employment seniority date.

As a part of the on the job training for an operator's position, the company may require white and Negro employees to serve for a reasonable time as tray handlers in the miscellaneous category or in other subordinate jobs the company deems necessary. In this and other respects training must be nondiscriminatory. A transferee from prefabrication to fabrication for a job that will prepare him to be a machine operator shall nevertheless be granted departmental seniority on the date of transfer computed from his employment date seniority.

While these temporary procedures are in effect, the company may suspend, if it deems advisable, the six-month and note of intent transfers.

For every person transferred under these procedures from the prefabrication department, the company may hire a replacement from the street, and to that extent its obligation under the collective bargaining agreement to hire into prefabrication from the stemmery is modified. This provision is designed to prevent the company's new labor pool from being restricted to seasonal employees.

The company and the union shall be restrained from enforcing directly or indirectly any provision of any collective bargaining agreement or practice or from taking any other action which conflicts with the terms of this decree.

The plaintiffs are entitled to recover from the defendants, jointly and severally, their costs, including a reasonable attorney's fee, 42 U.S.C. § 2000e–5(k). If after twenty days the parties have not agreed upon a fee, the court will allow it upon consideration of a statement of services filed and served upon counsel for the defendants who shall have ten days to serve and file a response.

This Memorandum is intended to contain the findings and conclusions required by Fed.R.Civ.P. 52.