577 F.2d 1135
 17 Fair Empl.Prac.Cas. 622, 16 Empl. Prac.
Dec. P 8310
Nora LEWIS, Elizabeth Bullock, Mary Carter, Betty Johnson,
and Gertrude Moody, each Individually and on
behalf of all other persons similarly
situated, Appellees,
v.
TOBACCO WORKERS' INTERNATIONAL UNION, an unincorporated
association, Appellant,
Philip Morris, Incorporated, a corporation, and Local 203,
Tobacco Workers' International Union, an
unincorporated association, Defendants.
Nora LEWIS, Elizabeth Bullock, Mary Carter, Betty Johnson,
and Gertrude Moody, each Individually and on
behalf of all other persons similarly
situated, Appellees,
v.
LOCAL 203, TOBACCO WORKERS' INTERNATIONAL UNION, an
unincorporated association, Appellant,
and
Philip Morris, Incorporated, a corporation, Tobacco Workers'
International Union, an unincorporated
association, Defendants.
Nora LEWIS, Elizabeth Bullock, Mary Carter, Betty Johnson,
and Gertrude Moody, each Individually and on
behalf of all other persons similarly
situated, Appellees,
v.
PHILIP MORRIS, INCORPORATED, a corporation, Appellant,
Tobacco Workers' International Union, an unincorporated
association, and Local 203, Tobacco Workers'
International Union, an unincorporated
association, Defendants.
 Nos. 76-1998, 76-1999 and 76-2199.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 6, 1977.
Decided May 10, 1978.
 
 Myron D. Cohen, New York City (Edward F. Butler, Conboy, Hewitt, O'Brien & Boardman, New York City, Lewis T. Booker, Virginia W. Powell, Richmond, Va., Hunton & Williams, Richmond, Va., on brief), and Jay J. Levit, Richmond, Va. (Stallard & Levit, Richmond, Va., James F. Carroll, New York City, on brief), for appellants.
 Jack Greenberg, New York City (Barry L. Goldstein, Washington, D. C., Henry L. Marsh, III, William H. Bass, III, Richmond, Va., John W. Scott, Jr., Fredericksburg, Va., Randall G. Johnson, Hill, Tucker & Marsh, Richmond, Va., on brief), for appellees.
 Before RUSSELL, WIDENER, and HALL, Circuit Judges.
 WIDENER, Circuit Judge:
 
 
 1
 Philip Morris, Inc., the Tobacco Workers International Union, and Local No. 25 of the Tobacco Workers International Union appeal from a judgment finding them liable for a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.
 
 
 2
 This suit is a class action[1] brought by five black employees of Philip Morris. It is the second such suit in recent years, repeating many of the assertions made in Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968). The plaintiffs' claim involves the allegation that the company, through discriminatory initial job assignment policies, segregates workers into black and white departments.
 
 
 3
 There are four departments[2] at the Philip Morris plant in Richmond, Virginia, three of which have permanent jobs, while at the remaining department the work is seasonal. The most attractive and skilled jobs, providing the best pay and the brightest opportunities for advancement, are in the fabrication department, where cigarettes are actually manufactured. Employees in fabrication are 41.1% black. The pre-fabrication department, second ranked in pay and desirability and which involves largely unskilled and considerable heavy labor, is where the bulk tobacco is processed into cut filler for use in the manufacturing of cigarettes. Its employees are 85.2% black. WSR, the warehouse department, third ranked in pay and which also involves heavy labor, largely unskilled, has 27.8% black employees. All of these three departments have permanent, as opposed to seasonal, jobs. The fourth department is the stemmery. It is the lowest paying department, almost wholly unskilled, and employment is seasonal rather than permanent, and it has 95.4% black employees.
 
 
 4
 The seasonal work is in the stemmery, where the current crop of tobacco is processed for aging and storage. Historically, the stemmery has been predominantly black, and it remains so. The gravamen of the plaintiffs' complaint is that the company and the unions purposely assigned black employees to the stemmery, which was the most unfavorable department in the company's operation.[3]
 
 
 5
 The court, although finding a violation of Title VII for another reason, was unable to find that "the excessive assignment of blacks to the stemmery was purposefully undertaken by the company to covertly continue its historical system of segregated departments." Additionally, the court absolved the unions of any charges that they violated their duty of fair representation.
 
 
 6
 However, in spite of the absence of purposeful discrimination by the company or the lack of fair representation by the unions, the district court found the black employees believed that the company discriminated against members of their race in the assignment of jobs. Therefore, it held that the company was liable because it did not inform "all applicants for hourly positions at the beginning of any interview (1) of the positions currently available in each of the four departments with an appropriate job description, and (2) that it assigns and hires new workers without reference to race."[4] Accordingly, it ordered recovery of damages to class members who were not so advised and "believed that their race substantially limited their initial employment."
 
 
 7
 We are of opinion that the district court erred in giving relief to certain members of the plaintiff class through the formulation of a duty which Title VII does not require.
 
 
 8
 * Initially, we dispose of a procedural point raised by the appellees, who have moved for dismissal of this appeal on the ground that the order appealed from is not a final order granting relief, citing Liberty Mutual v. Wetzel, 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976). That order, entered on September 2, 1976,[5] adopted to the letter the plaintiffs' proposed guidelines for relief. While the guidelines consist in part of additional findings of fact and conclusions of law, they require the defendants, among other things, to supply a list of all members of the class eligible for back pay, to pay interim attorneys' fees, to develop job descriptions, not to limit transfer of employees from the stemmery at season's end, to hire both permanent and seasonal employees at each employment office, to advise all employees of all vacancies, and to keep applications active and on file for a period of no less than one year.
 
 
 9
 In determining whether an order is or is not an injunction, we look to the substance, rather than the form, of an order. Ettelson v. Metropolitan Life Insurance Co., 317 U.S. 188, 63 S.Ct. 163, 87 L.Ed. 176 (1942). We believe the guidelines, requiring the defendants to act in some instances and forbidding them to act in others, to be an injunction.[6] We do not agree with the plaintiffs' position that the guidelines, although requiring present affirmative action or restraint, are yet unappealable. Nor does it gain support from Liberty Mutual, supra, for there the court merely had found a violation of the act and had not ordered the defendants to take, or refrain from, any action or to pay attorneys' fees. See 424 U.S. at 742, 96 S.Ct. 1202.II
 
 
 10
 As noted above, this case is an extension of, or the same, controversy decided ten years ago in the district court. In that case, Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968), two black employees brought a suit on behalf of all black employees of Philip Morris, alleging "that the defendants by their employment practices and collective bargaining agreement refused to hire, promote to supervisory positions, pay, advance and transfer Negro employees on the same basis as white employees." 279 F.Supp. at 507.
 
 
 11
 While finding that the company had discriminated against two Negroes with respect to pay and against the named plaintiff Quarles and the Negroes hired in the prefabrication department before January 1, 1966 with respect to advancement, transfer, and seniority, the Quarles court expressly found that Philip Morris had not engaged in discriminatory hiring practices since January 1, 1966 and that the company's policy for assignment of workers to the stemmery did not violate Title VII.[7] Because of the similarity of the contentions presented in Quarles with those made in the present case, the inclusion of the present seasonal class members (black stemmery employees) in the Quarles class (all black employees), and the actual membership in the Quarles class by two of this suit's named plaintiffs who were employed by Philip Morris at the time of the Quarles judgment, the defendants have contended at all stages of this litigation that the doctrines of res judicata and stare decisis should apply to the present controversy.
 
 
 12
 The court below recognized that the application of res judicata, or even stare decisis, would be highly damaged to the plaintiffs' case; the vindication, in 1968, of the company's hiring practices and stemmery assignment practices would bind, insofar as the court found that, up to the time of the 1968 judgment, the hiring practices were not racially motivated, the black female plaintiffs and the black male plaintiffs on the question of racial discrimination. The district court refused to implement res judicata on the ground that the members of the Quarles class could not be constitutionally bound by that decision because the class members had not been notified of the pendency of the suit.[8]
 
 
 13
 Thus, a decision as to the applicability of the rule of res judicata would necessarily require a determination of the constitutionality, facially or as applied, of the provision in FRCP 23 making a judgment binding on a member of a FRCP 23(b)(2) class regardless of whether the individual was notified of the suit. Because we are of opinion the district court's judgment should be reversed on grounds independent of the binding effect of the Quarles judgment, we decline to consider that issue. Ashwander v. TVA, 297 U.S. 288, 341, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).
 
 III
 
 14
 We now turn to the merits of the appeal. The issues in the litigation, agreed to prior to trial by the plaintiffs and the company, are (1) whether the members of the class were hired into the stemmery rather than into permanent employment as a result of racial or sexual discrimination, and (2) whether the transfer, promotion, seniority, initial job assignment, and wage rate policies discriminate against class members on the basis of race or sex, except in the selection of supervisory and craft personnel. All claims for affirmative relief on the basis of alleged discriminatory working or disciplinary conditions were withdrawn by the plaintiffs.
 
 
 15
 In its opinion, the district court found that the excessive assignment of black employees to the stemmery was not motivated by a racially discriminatory animus. It made no finding that female employees were assigned to the stemmery because of their sex. Additionally, the court found that the provisions of the collective bargaining agreement governing transfer, promotion, and seniority were non-discriminatory and would not have to be changed, but that discrimination existed in transfer, promotion, and seniority because of initial assignment, as we discuss later.
 
 
 16
 With these and other holdings later mentioned the district court held both the company and the unions to liability. While the opinion is not clear on the precise grounds on which it rests, it can only be on one of two. First, that the company and the unions had "unfortunately done nothing to dispel the belief, founded on . . . (the company's) past acts of discrimination, and held by a substantial number of black applicants that it still assigns to departments new hires on the basis of race." Second, that the company "in order to reassert a balance, should have informed all applicants for hourly positions at the beginning of any interview (1) of the positions currently available in each of the four departments with an appropriate job description, and (2) that it assigns and hires new workers without reference to race."
 
 A.
 
 17
 So far as the opinion of the court below may be said to have been based on the defendants' failure "to reassert a balance" in its work force, the district court erred in its interpretation of the demands of Title VII. Title VII does not require a racially balanced work force, for such a conclusion is, in the words of the Supreme Court, an "erroneous theory." Teamsters v. United States, 431 U.S. 324, 339-40, n. 20, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Moreover, the problem is explicitly dealt with by the statute.
 
 
 18
 Section 703(j) of the Act, 42 U.S.C. § 2000e-2(j), makes clear that employer liability may not be based solely on the existence of a racial imbalance among employees, when the district court has found the absence of purposeful discrimination. As explained by Senator Humphrey, the purpose of this provision is to indicate the absence from the statute of any required racial balance:
 
 
 19
 "A new subsection 703(j) is added to deal with the problem of racial balance among employees. The proponents of this bill have carefully stated on numerous occasions that Title VII does not require an employer to achieve any sort of racial balance in his work force by giving preferential treatment to any individual or group."
 
 
 20
 Legislative History of Title VII and IX of the Civil Rights Act of 1964, Equal Employment Opportunity Commission, Superintendent of Documents, p. 3005. Thus, § 703(j)[9] forbids court ordered preferential treatment designed solely to achieve a racial balance, as well as the formulation of liability based merely on the lack of racial balance.[10] As far as the opinion of the court below founded liability solely on the company's failure to "reassert a racial balance," even though the defendants were not presently discriminating, it is in error.
 
 B.
 
 21
 The analysis of the second ground of the district court's decision is not so brief but leads to the same conclusion.
 
 
 22
 The district court considered statistical evidence that from 1965 to 1974 63% of all black employees hired were either assigned to the stemmery or prefabrication, while, during the same period, only 18.2% of the white employees were so assigned to these two departments. 50% of the black employees initially hired during the period went into the stemmery, compared to 11.5% of the white employees hired in the same period. During those years, an average of 79.5% of the employees hired into the stemmery were black, and the average percentage of black employees in the stemmery work force was 84.3%. The average percentage of black people in the Richmond work force during that period was about 24%. The court considered that the company had previously maintained segregated departments until the early 1960s and was of opinion the plaintiffs had made out a prima facie case. It appeared however that in fabrication, the most desirable department in the company, the respective numbers of black and white employees was not different enough from the make-up of the work force in the area to draw any inference of discrimination therefrom, and the same applied to the warehouse, the third most desirable department. In prefabrication, the second most desirable department, black employees predominated. It also appeared that, commencing in 1971, seasonal employment was conducted on separate days or at separate locations, and for the two years immediately past only 5.3% of the applicants for seasonal employment were white. The hiring of black and white employees into the stemmery during those past two years was proportional to the applications received.
 
 
 23
 The district court concluded that it was "unable to find" "that the excessive assignment of blacks to the stemmery was purposefully undertaken by the company to covertly continue its historical system of segregated departments." Considering that Teamsters has made it clear that statistical analysis serves an important role in cases concerning employment discrimination and statistics are competent proof of such, but that, like any other kind of evidence, their usefulness depends on all the surrounding facts and circumstances, the statement of the Court that statistics showing racial or ethnic imbalance were probative in that case "only because such imbalance is often a telltale sign of purposeful discrimination," Teamsters, n. 20, is consistent with the ruling of the district court here that, despite the prima facie statistical case, purposeful discrimination was not shown. It is thus clear that, although the district court considered whether or not to base its finding on a prima facie statistical case, it decided not to, rather finding that the statistical case did not support the conclusion of purposeful discrimination.
 
 
 24
 Instead, the district court found that "the answer in the court's view lies in the testimony of the plaintiff's witness that 'if you want to get hired you know being black your best chance would be to go through the stemmery and then transfer to permanent employment later.' " The reasoning behind this statement by the district court was reiterated in various ways throughout the opinion. For example, it provided for recovery for those class members who were not informed by the company when they were hired that the company did not discriminate and about all job openings, and "that believed that their race substantially limited their initial employment to the stemmery." It further stated that it had "concluded that class members are often lead to seek employment in the stemmery on the basis of past racial discrimination." It found that the collective bargaining contract provisions concerning seniority, transfer, and promotion did not have to be changed, and like the Quarles court, it found seasonal employees to be poorer workers on the whole who had to prove themselves before given the rights and benefits of permanent employees.
 
 
 25
 We do not think a failure of the company to announce innocence is a violation of Title VII. Neither do we think the failure of the company to advise black applicants for stemmery jobs of positions available in the other departments is a violation of Title VII, when the company treated all applicants, black and white, the same. This is especially true when we consider that the first and third departments in order of desirability were not even found by the district court to be statistically racially imperfect in make-up or hiring, and, in the second most desirable department of the company, black employees predominated both in numbers and in hirings.
 
 
 26
 Nor is it permissible to base recovery on the subjective belief of class members "that their race substantially limited their initial employment to the Stemmery." Basing recovery on that fact is an improper consideration. The question is whether or not the company did in fact discriminate, not whether or not the employee did in fact believe the company had discriminated. It is at once apparent that the consideration of these two questions is entirely different.[11]
 
 
 27
 The district court found that the company's history of segregated departments and the continued dominance of black employees in the stemmery and prefabrication departments had led a substantial number of black applicants for employment to understand that their most likely opportunity for employment would be in the stemmery. The court made this finding on the testimony of one witness, a black female. She had applied for work in the fabricating department, had been turned down, and a short while later applied for work in the stemmery and was accepted. It was she who testified that if a black applicant wanted to get hired his best chance would be to go through the stemmery and then transfer to permanent employment later. She had done just this.
 
 
 28
 Basing its entire holding on the testimony of this witness is error for two reasons.
 
 
 29
 First. The witness herself had not been discouraged from application for work in fabrication, for she had in fact applied, so the acts of the witness as opposed to her testimony could not cause a negative inference to be taken against the company to prove the point the court wanted to make: that black applicants believed they would not be hired into the permanent departments so they applied to the stemmery instead of for permanent employment. Not only did the district court fail to find discrimination in hiring in the fabrication department, as might be logical from the testimony, not a single other witness testified that he had been discouraged by belief or otherwise from applying for work in one of the permanent departments, so the testimony of the one witness stands alone, and her own acts belie her words. Second, and equally as important, in the years from 1965 through 1974, there was a total of 3388 black employees hired into permanent departments. This number itself is telling evidence that none of them were discouraged from applying for work in the permanent departments. Also during those years there were 3484 black employees hired into the stemmery. Not one of them testified that he had been discouraged from seeking employment in one of the permanent departments, nor that he even had the belief that he would not have been accorded equal consideration had he made application. Accordingly, we are of opinion that on the record before us this finding of fact by the district court is clearly erroneous. FRCP 52(a).
 
 
 30
 At this point we should say that, had either the doctrines of res judicata or stare decisis been applied, those parts of this opinion discussing racial discrimination in hiring into the stemmery would have been inappropriate, or at least largely so, for the plaintiffs would have been bound by the earlier decision in Quarles. We have so held in a case indistinguishable on its facts, Griggs v. Duke Power Co., 515 F.2d 86 (4th Cir. 1975), and the district court recognized this in its opinion as it recited (obviously referring to the situation at hand) that the plaintiffs were litigating "in the face of a seemingly valid judgment directly on the matter in controversy." (Italics are the district court's) Even considering that our characterization just above of the import of the district court's language may be incorrect, in Quarles the court held, on page 508, that ". . . since January 1, 1966, the company has not discriminated on the grounds of race in its hiring policy. The court concludes, regardless of practices before January 1, 1966, relief on this issue is not now appropriate." This finding adverse to the plaintiffs was not appealed.[12] In the case before us now, the plaintiffs obviously realized that this holding in Quarles had to be circumvented in some way or other, and the decision of the district court that the Quarles plaintiffs did not properly represent the class and that the application of FRCP 23(b)(2) to the Quarles class plaintiffs was in violation of the Fourteenth Amendment (obviously meaning the Fifth Amendment) is the result. This undoubtedly accounts for the failure of the plaintiffs to try the present case on the theory that discrimination took place after the judgment of the district court in Quarles and to attempt to prove any such discrimination as a separate item from any discrimination which may have taken place before that judgment. See Griggs, p. 88. While an examination of the statistical evidence before and after the judgment in Quarles may not seem to disclose any differences of significant advantage to the plaintiffs, this case has neither been tried nor appealed on that ground. Believing that we should not unnecessarily approach the question of the constitutional validity, facially or in application, of FRCP 23(b)(2), see Wright on Federal Courts, 3d Ed. § 72, to these class plaintiffs, since the case may be decided on another ground, we expressly do not intimate any opinion as to the correctness of the holdings of the district court in that respect and also in respect to the matter of the class being inadequately represented in the Quarles case. The same reservation applies to the ruling of the district court refusing to apply stare decisis.
 
 
 31
 Accordingly, we are of opinion that those parts of the complaint alleging discrimination by the company based on race should be dismissed.
 
 C.
 
 32
 The district court held the unions to liability on much the same theory it held the company.
 
 
 33
 It found the unions had had a "checkered past," for until 1963 the local unions were segregated. The court found that their past indicated they had facilitated the company's tradition of segregated departments and that they should share the company's responsibility for informing their "members that all jobs are open in all departments without regard to race or sex so as to mollify members' present understandings as based on past history." Their "failure to perform this function makes . . . (them) jointly liable with the company to those plaintiffs entitled to recover."
 
 
 34
 The only thing in the record which would justify the court's finding of members' present understanding based on past history was the testimony of the black female witness we have above referred to and the finding based on it which we held to be clearly erroneous. Applying this finding to the unions is even more tenuous than to the company because the unions had nothing to do with hiring.
 
 
 35
 Because no member's present understanding has been proved in this case, finding such a present understanding is clearly erroneous. FRCP 52(a).[13]
 
 
 36
 We are thus of opinion those parts of the complaint alleging discrimination by the unions based on race should be dismissed.
 
 D.
 
 37
 The case of the class plaintiffs claiming discrimination on account of their female sex is different from that of the class plaintiffs claiming discrimination based on race.
 
 
 38
 Referring back, the agreed issues to be tried in this context were (1) whether women were hired into the stemmery on account of their sex, and (2) whether the transfer, promotion, seniority, initial job assignment, and wage rate policies discriminated against them on the basis of sex. All claims for affirmative relief sought on the basis of alleged discriminatory working or disciplinary conditions were withdrawn by the plaintiffs.
 
 
 39
 The court recited evidence and may have found that the company did not discriminate with respect to pay between the various job classifications with respect to race or sex. As previously recited, it found that the seniority, transfer, and promotional rules did not have to be changed. But it found that "(i)t is the initial assignment policies that taint the system," and held that seniority, transfer, and promotional restrictions of seasonal employees were discriminatory, although the holding did "not require a redrafting of those provisions." What we make of these seemingly contradictory rulings is that if an initial discriminatory assignment affected later rights, the employee might recover.
 
 
 40
 Remarkably, the district court did not make any finding as to whether or not women employees were assigned to the stemmery because of their sex, although we should have thought this was the principal issue in the case. Perhaps the reason was that its examination of the evidence agrees with our own admittedly brief consideration of some of the statistical evidence which shows that about the same percentage of women were hired into the stemmery as into permanent employment. 27.6% of the stemmery initial hires were female, while 25.3% of the employees whose initial hiring was into permanent departments were female.
 
 
 41
 Since we will not assume that sexual discrimination existed by reason of initial assignment to the stemmery, the principal issue left open, and upon which the whole case largely depends, is whether, upon hiring, the initial assignments of female employees to jobs, whether within the stemmery or within a permanent department,[14] were discriminatory on account of sex.
 
 
 42
 The district court recited that the plaintiffs produced evidence that several job classifications within various departments were predominantly male or female. It found that in the stemmery female jobs have been in the light category, while male jobs have been in the heavy category, and that certain higher order or key jobs were sexually stereotyped. It recited the plaintiffs' claim that the company maintains male and female job classifications within both the stemmery and the permanent departments. It found that there are female tag meter operators, male line-out and press operators, and forklift operators, and a predominantly male skeleton crew that works during the shutdown period of the stemmery. It found that the prefabrication department maintained light labor and heavy labor classifications and that in the fabrication department the jobs of head-fixer and fixer are male, while the jobs of catcher, attendant, examiner, and inspector are female. It also found there has never been a female transfer from the stemmery to the warehouse, but apparently did not attach any significance to the fact there has only been one female hired directly into the warehouse. How or why such classifications were discriminatory the district court did not say.
 
 
 43
 The plaintiffs point out, in addition, that in one instance there was evidence which tended to show that the company discouraged a female employee from transferring to a job as forklift operator.
 
 
 44
 The company insists that there was no evidence that any class member ever applied for and was denied promotion to any job which her seniority would have entitled her to hold. It also insists there was no evidence that, in any significant number of cases, females applied for jobs but were turned down in favor of junior males. It points out that in one particular job classification, which the district court had categorized as female, more than 100 female employees junior to those in that classification had bid for and been accepted in jobs, paying more than those of the categorized classification without a bid by those within the classification, which evidence tends to indicate, of course, that any categorization of the job as female had nothing to do with the company, rather with the employee's preference, about which the company could do nothing. The company further insists, without reply, that from 1966 until 1974 transfers were governed by a job preference system and from 1974 on by job posting and bidding, and that no nefarious operation of either system by the company or the union has been pleaded or proved. The district court did not address these matters.
 
 
 45
 The district court made few, if any, statistical findings with respect to sexual discrimination. It did not discuss the theory that an employee who had sought a job by preference was not discriminated against by the company. Much in the same manner as it approached the question of race discrimination, it found that it was "the duty and the burden of the defendants to inform all potential applicants for the various openings for said openings as they develop, and that these openings would be filled without regard to sex. . . ." It held that "those applicants in the class that were not so informed and would have applied for any such openings if informed are entitled to recover."
 
 
 46
 We have not attempted here any detailed analysis of the evidence with respect to sexual discrimination principally because the district court attempted none. If the district court's findings and recitals are true, there may well be a case of sexual discrimination. On the other hand, if the company's contentions, which it maintains are unrefuted, are true, there may well not be.
 
 
 47
 We are of opinion that this is a case in which "the findings of fact, on which the judgment was granted, were phrased in broad conclusory terms and did not include any subsidiary findings which would give appropriate support to the Court's conclusory findings." United States v. Commonwealth of Virginia, 569 F.2d 1300 (4th Cir. 1978). As in EEOC v. United Virginia Bank-Seaboard National, 555 F.2d 403 (4th Cir. 1977), the court made no analysis of the statistical information or the weight to be accorded it under the facts advanced by the defendants. There is here as there an absence of a critical review of the relevant facts culminating in a coherent body of factual findings which is particularly called for in a discrimination case. For example, the company insists that upon employment into the stemmery female employees were advised of the heavy labor and light labor categories, and the wages therefor, and given a chance to indicate a preference for each. This is not taken account of by the district court, as was not, as previously recited, the fact that for a great number of years the company had apparently operated its transfer system either by maintenance of a job preference file or by job posting and bidding. The mere fact that a company or a union may have discriminated on account of sex before the Civil Rights Act is not enough upon which to base a finding of liability if present discrimination is not shown, see Hazelwood School District v. United States, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), and as with the matter of racial discrimination, the failure to proclaim innocence is no ground to base liability upon.
 
 
 48
 While it may be thought from what we have said that the failure of the district court to make the key findings of whether or not women were hired into the stemmery because of their sex, and whether their initial job assignments upon hiring were discriminatory on account of sex, would lead to a dismissal of claims of the class for failure of proof, we do not believe that is a proper disposition of the case. There is enough in the conclusory findings of the district court to create a legitimate doubt as to whether or not discrimination on account of sex existed under the issues which were agreed to be tried. See Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).
 
 
 49
 Accordingly, the judgment of the district court with respect to sexual discrimination is vacated and remanded for reconsideration by the district court. On remand, the district court may consider the record before it, and may, within its discretion, take additional evidence if it be so advised.
 
 SUMMARY
 
 50
 The judgment of the district court is vacated, and the case is remanded.
 
 
 51
 On remand, the district court will dismiss the allegations of the complaint based on employment discrimination on account of race; those allegations of the complaint based on sexual discrimination will be the subject of reconsideration not inconsistent with this opinion.
 
 
 52
 While the opinion of the district court found for the unions on the issue of whether they had fairly represented their members, see 29 U.S.C. § 185(a), no order has been entered giving effect to that part of the opinion. We presume an order with respect to this issue will be entered on remand.
 
 
 53
 Following reconsideration of the case, the district court will reconsider its award of attorneys' fees.
 
 
 54
 VACATED and REMANDED.
 
 
 
 [1]
 The class consists of the named plaintiffs and all female and black male employees, whether currently employed or no longer employed for any reason, who were employees of the defendant Philip Morris' Green Leaf Stemmery on or after July 2, 1965
 
 
 [2]
 We speak of four departments throughout this opinion merely for convenience. Actually, the fourth department, the stemmery, is a separate plant and is not an integral part of the manufacturing process at the Richmond, Virginia cigarette plant
 
 
 [3]
 Before trial, the plaintiffs and Philip Morris stipulated that the following were the only issues to be tried:
 "(1) whether the members of the class were hired into the stemmery rather than into permanent employment as a result of racial or sexual discrimination;
 (2) whether the transfer, promotion, seniority, initial job assignments and wage rate policies discriminated against class members on the basis of race and sex, except in the selection of supervisory personnel;
 (3) if discrimination in any of the foregoing were found, whether injunctive relief is appropriate and what amount of back pay, if any, should be awarded class members;
 (4) what costs, expenses and attorneys' fees should be awarded."
 The plaintiffs charged the unions with complicity in alleged purposeful discrimination and with a violation of their duty of fair representation as imposed by federal labor law.
 
 
 [4]
 The following finding from the memorandum opinion is significant:
 "The Court is unable to find, however, on the basis of the record before it that the excessive assignment of blacks to the stemmery was purposefully undertaken by the company to covertly continue its historical system of segregated departments. What has been established is that the Company, although liberally proclaiming that it assigns new hires without regard to their race, has unfortunately done nothing to dispel the belief, founded on its past acts of discrimination, and held by a substantial number of black applicants that it still assigns to departments new hires on the basis of race. Such a belief has translated itself into a set of circumstances that has continued to place blacks at a disadvantage when seeking employment at Philip Morris. The Company's professed neutrality is, in fact, not neutral, for past acts of discrimination continue to significantly affect modern practice. 'Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices.' Griggs v. Duke Power Co., 401 U.S. 424, 430, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). See also Quarles v. Philip Morris, Inc., supra. The Company, in order to reassert a balance, should have informed all applicants for hourly positions at the beginning of any interview (1) of the positions currently available in each of the four departments with an appropriate job description, and (2) that it assigns and hires new workers without reference to race. All those class members that were not so informed when they were hired into the stemmery, and that believed that their race substantially limited their initial employment to the stemmery are entitled to recover for their losses."
 
 
 [5]
 The parties do not contest that an earlier July 7, 1976 order is not an appealable order. That order merely found for the plaintiffs on the issue of liability, and did not require the defendants to take any action. It only required "counsel" to "forward to the court . . . suggested procedures appropriate to facilitate an award of relief pursuant to the memorandum filed herein." For a similar order, see Liberty Mutual
 
 
 [6]
 A further indication that the district court understood its own order to require immediate actions of the defendants is that, on October 12, 1976, the court granted a stay of the order pending appeal. Had the order not contemplated present acts from, or restraints on, the defendants, such a stay would have been superfluous. Moreover, in opposing the stay, the plaintiffs at that time took the position that the order placed present requirements on the defendants and argued against the equity of relieving them of the burden of complying with the order during the pendency of the appeal.DB (3, 4) But the plaintiffs say, assuming the law to be as we have just recited, the appeal must nevertheless be dismissed because the district court, by order of November 17, 1976, vacated the order of September 2, 1976 from which this appeal has been taken. While the district court did attempt, through the order of November 17, 1976, to vacate the order appealed from, it had no power, after the notices of appeal were filed, to enter such an order. In this, the plaintiffs are not aided by the power given to the district court through FRCP 62(c) which only applies to allow the district court to make provision for the "security of the rights of the adverse party." Although the proceedings in the district court are not stayed by an application for an interlocutory appeal under 28 U.S.C. § 1292(b), this is an appeal from the granting of an injunction under § 1292(a), and the district court lost its power to vacate the order when the notices of appeal were filed. In this sense, this case is similar to Zimmer v. McKeithen, 467 F.2d 1381 (5th Cir. 1973), where, after the notice of appeal from a reapportionment order was filed, the district court attempted to change the order to encompass an alternative apportionment plan. A panel of the Fifth Circuit refused to consider the latter order, calling it a nullity. The panel decision was reversed on its treatment of the merits of the district court's first order by an en banc court, 485 F.2d 1297 (5th Cir. 1973), and the en banc court was affirmed by the Supreme Court, which also examined only the original order of the district court, noting without criticism the panel's refusal to consider the second order. Opinion styled East Carroll Parrish School Board v. Marshall, 424 U.S. 636, at p. 638, n.4, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). Significantly, the en banc court, as affirmed by the Supreme Court, reversed the district court, a result which might have been obviated by the consideration of the second order, which would have replaced the offensive elements of the first order. Hence, we believe the Supreme Court has at least tacitly acknowledged that a district court loses jurisdiction to amend or vacate its order after the notice of appeal has been filed, which we hold. See also Sumida v. Yumen, 409 F.2d 654 (9th Cir. 1969), cert. den., 405 U.S. 964, 92 S.Ct. 1168, 31 L.Ed.2d 240, reh. den., 405 U.S. 1048, 92 S.Ct. 1308, 31 L.Ed.2d 591 (1972); Aune v. Reynders, 344 F.2d 835 (10th Cir. 1965); Ideal Toy Corp. v. Sayco Doll Corp., 302 F.2d 623 (2d Cir. 1962); District 65, Distributive, Processing and Office Workers Union v. McKague, 216 F.2d 153 (3d Cir. 1954); Miller v. United States, 114 F.2d 267 (7th Cir. 1940)
 
 
 [7]
 The findings of the court included:
 "I. The company has not engaged in discriminatory hiring practices since January 1, 1966, and consequently, the plaintiffs are not entitled to relief on this issue.
 II. The company has not discriminated on racial grounds with respect to employment and promotion of supervisory personnel.
 III. The company has discriminated on grounds of race with respect to the pay of two employees, Ephriam Briggs and Mrs. Lillie J. Oatney; the plaintiffs have failed to establish discrimination against Negroes with respect to pay.
 IV. The defendants have discriminated against Douglas R. Quarles and the class consisting of Negro employees who were hired in the prefabrication department before January 1, 1966, with respect to advancement, transfer, and seniority. The plaintiffs are entitled to relief correcting this discrimination." 279 F.Supp. at p. 507.
 
 
 [8]
 The district court also stated that it believed the interests of the stemmery workers were not adequately represented in the Quarles action
 
 
 [9]
 42 U.S.C. § 2000e-2(j) provides in part:
 "Nothing contained in this subchapter shall be interpreted to require any employer . . . (or) labor organization . . . to grant preferential treatment to any individual or any group because of the race . . . (or) sex . . . of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race . . . (or) sex employed by an employer . . . ."
 
 
 [10]
 We are not unmindful that the existence of a racially unbalanced work force might support an inference of purposeful discrimination. See Teamsters, p. 340 n. 20, 97 S.Ct. 1843. In the face of the district court's finding that the defendants did not purposefully discriminate against black employees, that inference should not be drawn
 
 
 [11]
 Whether or not the company complied with 29 CFR § 1601.27 concerning posted notice of no discrimination is not discussed in the opinion of the district court
 
 
 [12]
 The Quarles order provides in its first paragraph:
 "1. The plaintiffs' prayer for an injunction requiring Phillip Morris, Inc., to modify its current hiring practice is denied."
 
 
 [13]
 We do not intimate that the district court's theory of holding the unions to liability is correct. It is simply not necessary for us to address the point
 
 
 [14]
 The record suggests very few initial hires into permanent departments were later employed in the stemmery